Michael J. Reiser (133621)
  *michael@reiserlaw.com*
Matthew Reiser (315301)
  *matthew@reiserlaw.com*
Isabella Martinez (315299)
  *isabella@reiserlaw.com*
REISER LAW, p.c.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (415) 510-2544

Tyler Meade (160838)
  *tyler@meadefirm.com*
Samuel Ferguson (270957)
  *sam@meadefirm.com*
Seena Forouzan (317777)
  *seena@meadefirm.com*
THE MEADE FIRM p.c.
12 Funston Ave., Suite A
San Francisco, California 94129
Telephone: (415) 724-9600
Facsimile: (925) 476-0304

*Attorneys for Plaintiffs*

(Additional Counsel on Signature Block)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Atkins Investment Partnership; Edward Atkins, trustee of the Edward M. Atkins Trust; Vernon James Armour, trustee of the Vernon James Armour, Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018; Ronald Berman, trustee of the Ronald Berman Revocable Trust; Elizabeth Blinderman; Paul Blinderman, trustee of the Paul Blinderman Revocable Trust; Joseph M. Boniecki; Patricia Booth, trustee of the Patricia Booth Revocable Trust and the Laurence O. Booth Irrevocable Family Trust of 2012; Anne Burke; John Burke; Christopher John Burke; Francis Campise; Joseph Campolo, Jr. individually and as trustee of the Joseph P Campolo Jr. Revocable Trust; Joseph S. Chasen; Mari Christopherson, trustee | Case No. <br><br> **COMPLAINT FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

of the Mari Louisa Christopherson Trust; Amy Chuckrow and Jonathan Stulgis, trustees of the Trust Under the Will of Robert Chuckrow Deceased; Sherwood Guernsey, trustee of the Carol C. Guernsey Irrevocable Trust; Phillip Crump; David Decker, Sr. individually and as trustee for the Mary Louise Decker Family GST Trust; David Decker, Jr., trustee of the 2017 Decker Family Irrevocable Gift Trust; 2012 DPDS Fund L.P.; Barbara Drumm; Dusty47 LLC; Four J Family LLC; Jeffrey Goldberg, trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995; Harmony Investments LLC; Charles Harrold, III; Margaux Marbury Harrold; Stephanie Harrold, trustee of the Stephanie A. Harrold Revocable Trust; Nancy Lynn Morton, trustee of the Harrold Family Dynasty Trust; Charles Cotton Harrold IV, trustee of the C. Cotton Harrold IV Investment Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust; JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly; Sally Jo Morris, trustee of the Suzanne Kanis Revocable Trust; Ronald D. Kaplan; Michael R. Kaskie; Kilrea Family Investments, LLC; Scott Kilrea, trustee of the Scott Kilrea Trust U/A DTD 04/14/1997; John Henry Koehler III; Sandra Sue Koehler; Karl Henry John Koehler III and Inna Koehler, trustees of the Jay Koehler and Inna Koehler Living Trust; Kreiseder Family LLC; LTR I LLC; Sheffee Lulkin; Shefee Lulkin & Associates, Inc.; John L MacCarthy, trustee of the John Leland MacCarthy Revocable Trust; John D. Marschall, trustee of the John D. Marschall Trust; Peter J. McDonald, trustee of the Peter J. McDonald Trust DTD 04/22/2010; William McKenna; Nancy Mengel; Robert Mueckler, II;

Steven Patrick Nedelka; Holly Nelson-Johnson and Terry Nelson-Johson, trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust; Mark Ordower, trustee of the Mark Ordower Revocable Trust; Ordower Investments; James Papesch; Peer Pedersen, Jr., trustee of the Declaration of Trust of Peer Pedersen; John Muehlstein, trustee of the Peer Pedersen Trust; Barry Lance Polonitza; Ruthmarie Connor, trustee of the Rollin Polonitza Family Trust; Mary Polonitza, trustee of the Jard Polonitza Separate Property Trust; Beri Lynn Polonitza, trustee of the Beri Lynn Polonitza Revocable Trust; Phillip Porpora, trustee of the Phillip Porpora Trust; Liza Reynolds Limited Partnership; RJDC Management Company LLC; Scott Anthony Ronan; Jerry G. Ryder; Kimberly Seeds; James Sharman; Victoria Clewell, trustee of the Ronald J. Sloane Family Trust; SSSB Partnership; Jonathan Stulgis, trustee of the Jonathan W. Stulgis Family Trust; Doris J. Wik; Frances Armour Williamson, trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour Williamson; Yiming Zhang; Stephen Jay Akana; Harminder Brar and Pearlene Brar as trustees of the Brar Family Trust; Robert Brilliant, trustee of the Brilliant Family Trust; Jerome Yap Chua; Orla Cunningham, LLC; Barry P. Garrison, trustee of the Barry P. Garrison; Eugene Goebel; Jessa Ann Goebel; Stephanie Marie Grein; Brent Horowitz and Heather Thompson as trustees of the Horowitz Family Trust; Julie Lewis; Stacy K. Li; Ronald McLeod, trustee of the Ronald McLeod Revocable Trust; John D. Michael; Daniel Michael and Lillian Leong as trustees of the Michael Leong Family Trust DTD 08/13/2013; Jennifer Mvongo, trustee of the Jennifer M. Mvongo Revocable Trust; Ramesh Patel and Alison Patel, trustees of the R. Patel and A. Patel TTEE, Kenew DBP

U/A DTD 12/31/2016; David Malcolm
Potts; Thomas F. Reiser, Jr.; James E.
Salter; Ridge Sampson, trustee of the
Ridge Sampson Revocable Trust; Aaron
Michael Silva; Gerald Guy Stokes, Jr.;
Max Luis Tejada; Trinh-Mai N. Vo; Bret
M. Walberg; Michael Witlin; Bennet
Woodward; Dimitri Katamanin,
individually and as trustee of the Four
Season's Trust; Sameer Kero, trustee of
the Flexedge Investment Management
Defined Benefit Pension Plan & Trust;
Sameer Kero; Chanda Mehta Kero; N.
Kero Investments, LTD., LLLP; S. Kero
Limited Partnership; Niloufer Kero;
Niloufer Kero, trustee of Niloufer Kero
Revocable Family Trust; Shawkat Kero;
Sarita Mehta; Narendrakumar Mehta;
Smita Mehta; Pareshkumar Desai;
Etienne Boillot and Stuart E. Lucas,
trustees of the GST Trust; Anthony V.
Dub; Michael Driscoll; Neal Driscoll;
Alia Driscoll; Dennis J. FitzSimons; U.S.
Bank N.A and Soyla V. Rausch as trustee
for the Carrie G. Cox TUW Tr. B FBO
Mary Hancock and the Harriet C. Collis
TUA Tr. B FBO Mary Hancock; William
Wayne Hancock III, trustee of the
George B. Hancock Trust; John Vance
Hancock; Nancy A.D. Hancock; Michael
Harrigan individually and as trustee for
the Michael J. Harrigan Trust; John H.
Heuberger, trustee of the WBK 2012
Trust; Loeb Holding Corporation;
Armando Pauker; SAS ARDIS;
Vasundhara Tolia; Osman Uslu; Bret M.
Walberg; Shai Wininger; Philip Nadel;
Blair Ambach; Chancellor Capital;
Sanjay Tolia; Vinay Tolia, trustee of the
Sanjay Tolia 2014 Annuity Trust; and
Jerry G. Ryder,

Plaintiffs,

v.

EisnerAmper, LLP; and Does 1 through
20,

Defendants.

1    The following Plaintiffs bring this action against EisnerAmper, LLP (sometimes

2    "Defendant" or, together with the Does, "Defendants") based upon the investigation of counsel

3    and information and belief: Atkins Investment Partnership; Edward Atkins, trustee of the Edward

4    M. Atkins Trust; Vernon James Armour, trustee of the Vernon James Armour, Trust dated

5    04/04/1988 and the Vernon James Armour Trust dated 08/14/2018; Ronald Berman, trustee of the

6    Ronald Berman Revocable Trust; Elizabeth Blinderman; Paul Blinderman, trustee of the Paul

7    Blinderman Revocable Trust; Joseph M. Boniecki; Patricia Booth, trustee of the Patricia Booth

8    Revocable Trust and the Laurence O. Booth Irrevocable Family Trust of 2012; Anne Burke; John

9    Burke; Christopher John Burke; Francis Campise; Joseph Campolo, Jr. individually and as trustee

10   of the Joseph P Campolo Jr. Revocable Trust; Joseph S. Chasen; Mari Christopherson, trustee of

11   the Mari Louisa Christopherson Trust; Amy Chuckrow and Jonathan Stulgis, trustees of the Trust

12   Under the Will of Robert Chuckrow Deceased; Sherwood Guernsey, trustee of the Carol C.

13   Guernsey Irrevocable Trust; Phillip Crump; David Decker, Sr. individually and as trustee for the

14   Mary Louise Decker Family GST Trust; David Decker, Jr., trustee of the 2017 Decker Family

15   Irrevocable Gift Trust; 2012 DPDS Fund L.P.; Barbara Drumm; Dusty47 LLC; Four J Family

16   LLC; Jeffrey Goldberg, trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995; Harmony

17   Investments LLC; Charles Harrold, III; Margaux Marbury Harrold; Stephanie Harrold, trustee of

18   the Stephanie A. Harrold Revocable Trust; Nancy Lynn Morton, trustee of the Harrold Family

19   Dynasty Trust; Charles Cotton Harrold IV, trustee of the C. Cotton Harrold IV Investment Trust;

20   JP Morgan Trust Company of Delaware, trustee of the Trust Under the Will of Marion E.

21   Horween FBO Nancy Horween Trust; JP Morgan Trust Company of Delaware, trustee of the

22   Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly; Sally Jo Morris, trustee of

23   the Suzanne Kanis Revocable Trust; Ronald D. Kaplan; Michael R. Kaskie; Kilrea Family

24   Investments, LLC; Scott Kilrea, trustee of the Scott Kilrea Trust U/A DTD 04/14/1997; John

25   Henry Koehler III; Sandra Sue Koehler; Karl Henry John Koehler III and Inna Koehler, trustees

26   of the Jay Koehler and Inna Koehler Living Trust; Kreiseder Family LLC; LTR I LLC; Sheffee

27   Lulkin; Shefee Lulkin & Associates, Inc.; John L MacCarthy, trustee of the John Leland

28   MacCarthy Revocable Trust; John D. Marschall, trustee of the John D. Marschall Trust; Peter J.

1  McDonald, trustee of the Peter J. McDonald Trust DTD 04/22/2010; William McKenna; Nancy

2  Mengel; Robert Mueckler, II; Steven Patrick Nedelka; Holly Nelson-Johnson and Terry Nelson-

3  Johson, trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust; Mark Ordower, trustee

4  of the Mark Ordower Revocable Trust; Ordower Investments; James Papesch; Peer Pedersen, Jr.,

5  trustee of the Declaration of Trust of Peer Pedersen; John Muehlstein, trustee of the Peer

6  Pedersen Trust; Barry Lance Polonitza; Ruthmarie Connor, trustee of the Rollin Polonitza Family

7  Trust; Mary Polonitza, trustee of the Jard Polonitza Separate Property Trust; Beri Lynn Polonitza,

8  trustee of the Beri Lynn Polonitza Revocable Trust; Phillip Porpora, trustee of the Phillip Porpora

9  Trust; Liza Reynolds Limited Partnership; RJDC Management Company LLC; Scott Anthony

10  Ronan; Jerry G. Ryder; Kimberly Seeds; James Sharman; Victoria Clewell, trustee of the Ronald

11  J. Sloane Family Trust; SSSB Partnership; Jonathan Stulgis, trustee of the Jonathan W. Stulgis

12  Family Trust; Doris J. Wik; Frances Armour Williamson, trustee of the Frances Armour

13  Williamson TTEE Revocable Trust of Frances Armour Williamson; Yiming Zhang; Stephen Jay

14  Akana; Harminder Brar and Pearlene Brar as trustees of the Brar Family Trust; Robert Brilliant,

15  trustee of the Brilliant Family Trust; Jerome Yap Chua; Orla Cunningham, LLC; Barry P.

16  Garrison, trustee of the Barry P. Garrison; Eugene Goebel; Jessa Ann Goebel; Stephanie Marie

17  Grein; Brent Horowitz and Heather Thompson as trustees of the Horowitz Family Trust; Julie

18  Lewis; Stacy K. Li; Ronald McLeod, trustee of the Ronald McLeod Revocable Trust; John D.

19  Michael; Daniel Michael and Lillian Leong as trustees of the Michael Leong Family Trust DTD

20  08/13/2013; Jennifer Mvongo, trustee of the Jennifer M. Mvongo Revocable Trust; Ramesh Patel

21  and Alison Patel, trustees of the R. Patel and A. Patel TTEE, Kenew DBP U/A DTD 12/31/2016;

22  David Malcolm Potts; Thomas F. Reiser, Jr.; James E. Salter; Ridge Sampson, trustee of the

23  Ridge Sampson Revocable Trust; Aaron Michael Silva; Gerald Guy Stokes, Jr.; Max Luis Tejada;

24  Trinh-Mai N. Vo; Bret M. Walberg; Michael Witlin; Bennet Woodward; Dimitri Katamanin,

25  individually and as trustee of the Four Season's Trust; Sameer Kero, trustee of the Flexedge

26  Investment Management Defined Benefit Pension Plan & Trust; Sameer Kero; Chanda Mehta

27  Kero; N. Kero Investments, LTD., LLLP; S. Kero Limited Partnership; Niloufer Kero; Niloufer

28  Kero, trustee of Niloufer Kero Revocable Family Trust; Shawkat Kero; Sarita Mehta;

1    Narendrakumar Mehta; Smita Mehta; Pareshkumar Desai; Etienne Boillot and Stuart E. Lucas,

2    trustees of the GST Trust; Anthony V. Dub; Michael Driscoll; Neal Driscoll; Alia Driscoll;

3    Dennis J. FitzSimons; U.S. Bank N.A and Soyla V. Rausch as trustee for the Carrie G. Cox TUW

4    Tr. B FBO Mary Hancock and the Harriet C. Collis TUA Tr. B FBO Mary Hancock; William

5    Wayne Hancock III, trustee of the George B. Hancock Trust; John Vance Hancock; Nancy A.D.

6    Hancock; Michael Harrigan individually and as trustee for the Michael J. Harrigan Trust; John H.

7    Heuberger, trustee of the WBK 2012 Trust; Loeb Holding Corporation; Armando Pauker; SAS

8    ARDIS; Vasundhara Tolia; Osman Uslu; Bret M. Walberg; Shai Wininger; Philip Nadel; Blair

9    Ambach; Chancellor Capital; Sanjay Tolia; Vinay Tolia, trustee of the Sanjay Tolia 2014 Annuity

10   Trust; and Jerry G. Ryder (collectively, "Plaintiffs").

11                                    **INTRODUCTION**

12          1.      This is an action by more than 130 Plaintiffs who collectively invested over $103

13   million in Direct Lending Income Fund, L.P. ("DLIF"),[1] a limited partnership managed and

14   controlled by Direct Lending Investments, LLC ("DLI") and its owner and CEO, Brendan Ross

15   ("Ross"). The venture turned out to be a $789 million dollar Ponzi scheme. The collapse began in

16   early 2019 when the Securities & Exchange Commission ("SEC") brought a fraud action against

17   DLI. A receiver was appointed shortly thereafter. A federal grand jury indicted Ross for ten

18   counts of wire fraud. He was arrested by the FBI in August 2020.

19          2.      DLI ostensibly managed its investors' funds by purchasing small, short term loans

20   with prime credit borrowers, an area underserved by traditional financing. By holding many

21   small, short term notes until maturity, DLI's strategy theoretically provided liquidity and allowed

22   investors to exit the fund on short notice while generating high and consistent returns. But many

23   of DLI's loans were in default, some reported loans did not exist at all, counterpary platforms that

24   sold and serviced DLIF's loans were related to Ross (DLI's CEO and owner), and over time DLI

25   began investing in high-risk speculative ventures that were not consistent with its investment

26   thesis of servicing small loans to creditworthy borrowers.

27   _____

28   [1] In 2016, Direct Income Lending Feeder Fund, Ltd. ("DLIFF") was established offshore for
     overseas investors in DLI.

1   3.  The massive Ponzi scheme stood on the foundation of clean audits issued with the

2 knowing, reckless and/or negligent participation of Defendant EisnerAmper, LLP.

3   4.  EisnerAmper markets itself as one of the largest auditors in the country with over

4 1900 employees and 200 partners. Of its audit practice, EisnerAmper highlights on its website

5 that "audit and assurance services are one of [the] most fundamental actions companies can take

6 to provide key stakeholders such as business owners, executives, board directors and investors

7 with the necessary level of confidence in the financial information they need to carry out their

8 responsibilities." EisnerAmper advertises that its "commitment to the highest standards of quality

9 and the importance of our own reputation ensure that our work product provides immediate

10 credibility to interest parties such as bankers, potential investors and all stakeholders."

11   5.  DLI was open only to accredited and institutional investors. Plaintiffs are mostly

12 trusts, limited liability companies, corporations, and individuals investing through self-directed

13 retirement plans. All made investments, or continued to hold investments, in DLIF in reliance on

14 EisnerAmper's auditing work. Many Plaintiffs utilized the services of a Registered Investment

15 Advisor ("RIA") in connection with their investments in DLI.

16   6.  Because of the due dilligence DLI's investors performed prior to and during

17 investments, either directly or through their advisers, clean audit opinions were central to DLI's

18 scheme, including audits authored by Defendant EisnerAmper on DLIF's 2013, 2014 and 2015

19 financials. EisnerAmper's audits "confirmed" year after year that DLIF's non-marketable "Level

20 3" assets were accurately and fairly valued. Without these clean audit opinions, DLI never would

21 have been able to collect and retain nearly $800 million in investments from 2013 through its

22 collapse in 2019. Indeed, with EisnerAmper's approval, DLI prominently featured EisnerAmper

23 as its auditor in DLIF's private placement memoranda, marketing materials and investor letters

24 between 2015 and 2016 — coinciding with DLI's period of explosive growth.

25   7.  All Plaintiffs relied on Defendant EisnerAmper for assurance that DLI's financials

26 were fairly stated.

27   8.  In truth, EisnerAmper had virtually no basis on which to state clean audit opinions.

28 It knowingly issued these opinions even though it never sought any confirmation evidence on the

1    vast majority of DLIF's assets, and never received confirmation evidence on over 50% of the

2    assets for which it did seek confirmation. On information, investigation and belief, EisnerAmper

3    reviewed the paper trail on less than 5% of DLIF's assets. Furthermore, in 2015, EisnerAmper

4    had actual knowledge that loans carried on DLIF's books did not exist, because "borrowers"

5    responded to EisnerAmper's audit confirmation requests that they did not take out such loans.

6         9.    Professional standards required EisnerAmper to issue a limited opinion or

7    withdraw as auditor owing to its failure to obtain confirmation evidence from DLIF's borrowers,

8    as a lack of evidence meant there was an insufficient basis to form an opinion on DLIF's

9    financials. Instead, EisnerAmper issued unqualified opinions stating DLIF's financials were

10   presented fairly.

11        10.   As set forth in detail herein, EisnerAmper's "audits" were so deficient that they

12   amounted to no audits at all.

13        11.   By this action, Plaintiffs seek damages against EisnerAmper for its failure to

14   conduct its audits under generally accepted auditing standards ("GAAS") and its other intentional,

15   reckless and/or negligent misconduct.

16        12.   To date, many of DLIF's assets (which EisnerAmper "confirmed" were worth

17   hundreds of millions of dollars) have been deemed worthless or liquidated for a small fraction of

18   the value assigned to them by the Funds' management and investment advisor, DLI.

19        13.   Amongst other wrongdoing, EisnerAmper audited DLIF's 2013 financials even

20   though BDO had already performed an audit over this period. Significantly, BDO's audit

21   contained an "Emphasis of Matter" (an accounting term of art) that highlighted risks in DLIF's

22   valuation methodology. Ross, concerned that this "Emphasis of Matter" would hinder his ability

23   to raise money, turned to EisnerAmper to restate the 2013 audit with the tacit understanding that

24   EisnerAmper would not include an "Emphasis of Matter."

25        14.   That DLI and Ross sought to engage EisnerAmper to redo the finished product of

26   another auditor (BDO) should have been a warning sign to EisnerAmper that DLI was auditor

27   shopping, a significant indicator of fraud. Ross's request for a redo of the 2013 audit should have

28

triggered professional skepticism and appropriate scrutiny by EisnerAmper. Instead, EisnerAmper took the assignment and diligently played its part to facilitate DLI and Ross's scheme.

15.     EisnerAmper issued a *new* audit on DLI's 2013 financials *without disclosing it was a restatement or disclosing any reasons for re-issuing the audit*, thus helping DLI conceal the BDO audit from DLI's potential investors.

16.     Professional standards clearly require that the reasons for a restatement of an audit be disclosed. Breach of this elementary obligation together with EisnerAmper's failure to perform basic confirmation procedures on DLIF's assets, its aquiescence in DLI's non-GAAP valuation methodology, and other audit failures detailed below, are clear evidence of EisnerAmper's knowing and/or reckless participation in DLI's fraud. Instead of acting on "red flags" it observed, EisnerAmper year after year (1) corroborated DLIF's misstatements, (2) confirmed the veracity of DLIF's financial statements and (3) issued audit reports, K-1s, Net Asset Value ("NAV") statements, and capital account statements that misrepresented DLIF's financial condition.

17.     Furthermore, EisnerAmper failed to adequately note a clear shift in DLI's purported investment strategy beginning in 2014. From inception, DLI explained its investment strategy as focused on acquiring small, short term loans to creditworthy borrowers with established businesses ("Direct Lending" is in its very name). Yet in 2014, DLI secretly began making large loans to other financial platforms, many of which were above 5% of DLI's NAV and therefore should have been separately disclosed as line items on DLI's balance sheet and accompanying notes. EisnerAmper was aware of DLI's false communications to investors throughout 2014 and 2015 that nothing had changed about its investment strategy as it was assuming greater risk and reallocating fund resources. The change was finally announced to investors in a December 2015 Private Placement Memorandum, but EisnerAmper's 2015 audit did not disclose that DLI had played fast and loose with its investors' money for over a year.

18.     In 2014, for instance, DLI made two loans totalling $7 million to a newly formed business entity, Talking Capital. These loans were approximately twelve times the size of DLI's next largest loan and approximately one hundred times the size of DLI's average loan. Talking Capital purportedly used the money to itself make large loans to inadequately capitalized "Tier 3"

telecom companies that routed calls to Eastern Europe and Africa. EisnerAmper did not properly disclose this in its 2014 audit. EisnerAmper did not disclose the concentration risk these loans represented, nor that the loans were a significant change in DLI's business strategy. Had EisnerAmper properly audited these loans, it would have discovered that Talking Capital failed to make the very first interest payment on its first loan, that DLI made its second loan to Talking Capital after it was in default on its first, that the paperwork regarding these loans was deficient, that the second loan did not identify any collateral, and that one of Talking Capital's principals who provided a personal guarantee on one of the loans had previously filed for bankruptcy and had been sued by JP Morgan for failing to honor a personal guarantee.

19.     EisnerAmper also failed to perform the requisite diligence on related party transactions, or disclose in its 2014 audit that Ross held an ownership interest in counterparties from which DLI purchased over 70% its loans.

20.     EisnerAmper also issued K-1s to Plaintiffs for tax years 2014 through 2016 that purported to show each Plaintiff's pro-rata share of DLIF's income and expenses and their individual capital account balances determined under GAAP. The K-1's however failed to confirm DLI's NAV due to DLIF's non-GAAP valuation methodology, which effectively overstated each investor's capital account balance and their proportionate share of DLIF's net income. This resulted in each investor paying tax on phantom income and Ross overstating his entitlement to substantial management fees.

21.     As set forth below, EisnerAmper's reckless audit reports, negligence and/or its effort to aid and abet DLI's fraud caused hundreds of millions of dollars in damages to Plaintiffs and investors. As a result, Plaintiffs assert claims against EisnerAmper for negligent misrepresentation, common law fraud, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and aiding and abetting securities fraud in violation of California Corporations Code section 25403.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(11) in that: (a) this Complaint is brought on behalf of over 99 plaintiffs who assert

1    common claims involving common questions of law and fact; (b) the total amount in controversy

2    exceeds $5,000,000; (c) at least one plaintiff is diverse from the Defendant.

3        23.    Venue is proper in the Northern District of California under 28 U.S.C. §1391(b)(2)

4    because a substantial part of the events or omissions giving rise to the claims occurred in this

5    district.

6                                              **PARTIES**

7    **Defendants:**

8        24.    Defendant EisnerAmper, LLP is a Delaware limited liability partnership with its

9    principal place of business in New York. EisnerAmper provided the accounting services, audits

10   and tax services to DLIF at its San Francisco office, which is now located at One California, Suite

11   1700.

12       25.    The true names and capacities of the Does 1 through 20, whether individual,

13   corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint

14   and Plaintiffs, therefore, sue said defendants by such fictitious names and will ask leave of court

15   to amend this Complaint to show their true names or capacities when the same have been

16   ascertained. Plaintiffs are informed and believe, and therefore allege, that each of the Doe

17   defendants is, in some manner, responsible for the events and happenings alleged herein and

18   proximately caused injury and damages to Plaintiffs as herein alleged.

19       26.    Plaintiffs are informed and believe, and on that basis allege, that each Defendant

20   named in this action, including each of the Doe defendants, was the agent, ostensible agent,

21   servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate

22   of each of the other Defendants, and was at all times relevant herein acting within the course and

23   scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-

24   conspirator, partner, joint venturer, representative and/or associate, and with the knowledge,

25   authorization, consent, permission, and/or ratification of the other Defendants.

26       27.    On information and belief, all actions of each Defendant alleged herein were

27   ratified and approved by the officers and/or managing agents of each other Defendant, whether

28   Doe or otherwise. The conduct, acts and omissions of Defendants, and each of them, as described

herein, were undertaken by their officers, directors, or managing agents, identified as Does 1-10. The conduct of these officers, directors, or managing agents was, therefore, undertaken on behalf of EisnerAmper. Further, Defendants, and each of them, had advance knowledge of the actions and conduct of those individuals, whose actions and conduct were ratified, authorized and approved by managing agents and by other officers, directors, or managing agents whose precise identities are unknown to Plaintiffs at this time. Plaintiffs thus identify and designate those individuals as Does 11-20.

**Plaintiffs:**

28.     Plaintiff Atkins Investment Partnership ("Atkins") is an Illinois partnership located in Glencoe, Illinois. Atkins purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

29.     Plaintiff Edward Atkins, a resident of Glencoe, Illinois, is the trustee of the Edward M. Atkins Trust ("Atkins Trust"). Atkins Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

30.     Plaintiff Vernon James Armour, a resident of Chicago, Illinois, is the trustee of the Vernon James Armour Trust dated 04/04/1988 and the Vernon James Armour Trust dated 08/14/2018 (collectively, the "Armour Trust"). The Armour Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

31.     Plaintiff Ronald Berman, a resident of Phoenix, Arizona, is the trustee of the Ronald Berman Revocable Trust ("Berman Trust"). The Berman Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

32.     Plaintiff Elizabeth Blinderman ("Blinderman") is an individual who resides in Chicago, Illinois. Blinderman purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

33.     Plaintiff Paul Blinderman, a resident of West Hollywood, California, is the trustee of the Paul Blinderman Revocable Trust ("Blinderman Trust"). Blinderman Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

34.     Plaintiff Joseph M. Boniecki ("Boniecki") is an individual who resides in Chicago, Illinois. Boniecki purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

35.     Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Patricia Booth Revocable Trust ("Booth Trust"). The Booth Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

36.     Plaintiff Patricia Booth, a resident of Chicago, Illinois, is the trustee of the Laurence O. Booth Irrevocable Family Trust of 2012 ("Booth Family Trust"). The Booth Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

37.     Plaintiff Anne Burke ("A. Burke") is an individual who resides in Houston, Texas. A. Burke purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

38.     Plaintiff John Burke ("J. Burke") is an individual who resides in Houston, Texas. J. Burke purchased securities from DLIF in the principal amount of $160,000.00.

39.     Plaintiff Christopher John Burke ("C. Burke") is an individual who resides in Lake Forest, Illinois.  C. Burke purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

40.     Plaintiff Francis Campise ("Campise") is an individual who resides in Chicago, Illinois.  Campise purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

41.     Plaintiff Joseph Campolo, Jr. ("Campolo") is an individual who resides in Winnetka, Illinois. Campolo purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

42.     Plaintiff Joseph Campolo, Jr. is also the trustee of the Joseph P Campolo Jr. Revocable Trust ("Campolo Trust"). The Campolo Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

43.     Plaintiff Joseph S. Chasen ("Chasen") is an individual who resides in Glenview, Illinois. Chasen purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

44.     Plaintiff Mari Christopherson, a resident of Chicago, Illinois, is the trustee of the Mari Louisa Christopherson Trust ("Christopherson Trust"). The Christopherson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

45.     Plaintiffs Amy Chuckrow and Jonathan Stulgis, both residents of Charlestown, Massachusetts, are the trustees of the Trust Under the Will of Robert Chuckrow Deceased ("Amy Chuckrow Trust"). Plaintiff Sherwood Guernsey, a resident of Williamstown, Massachusetts, is the trustee of the Carol C. Guernsey Irrevocable Trust, which received the assets of the Carol Guernsey Trust Under the Will of Robert Chuckrow after Mrs. Guernsey passed (collectively, the "Guernsey Trust"). The Amy Chuckrow and Guernsey Trusts are the beneficial owners of funds initially invested by The Robert Chuckrow Trust in DLIF, which are in excess of $75,000. The Chuckrow Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

46.     Plaintiff Phillip Crump ("Crump") is an individual who resides in Douglas, Michigan. Crump purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

47.     Plaintiff David Decker, Sr. ("D.A. Decker") is an individual who resides in Longboat Key, Florida. D.A. Decker purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

48.     Plaintiff David Decker, Sr. is also the trustee for the Mary Louise Decker Family GST Trust ("Decker Family Trust"). The Decker Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

49.     Plaintiff David Decker, Jr., a resident of Sarasota, Florida, is the trustee of the 2017 Decker Family Irrevocable Gift Trust ("2017 Decker Trust"). The 2017 Decker Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

50.     Plaintiff 2012 DPDS Fund L.P. ("DPDS Fund") is an Illinois limited partnership. DPDS Fund purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

51.     Plaintiff Barbara Drumm ("Drumm") is an individual who resides in Valparaiso, Indiana. Drumm purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

52.     Plaintiff Dusty47 LLC ("Dusty47") is a Delaware limited liability company. Dusty47 purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

53.     Plaintiff Four J Family LLC ("Four J") is a Delaware limited liability company. Four J purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

54.     Plaintiff Jeffrey Goldberg, a resident of Union Pier, Michigan, is the trustee of the Jeffrey M. Goldberg Trust u/a dtd 08/01/1995 ("Goldberg Trust"). The Goldberg Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

55.     Plaintiff Harmony Investments LLC ("Harmony") is a Michigan limited liability company.  Harmony purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

56.     Plaintiff Charles Harrold, III ("C. Harrold") is an individual who resides in Palm Beach Gardens, Florida.  C. Harrold purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

57.     Plaintiff Margaux Marbury Harrold ("M. Harrold") is an individual who resides in Palm Beach Gardens, Florida. M. Harrold purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

58.     Plaintiff Stephanie Harrold, a resident of Palm Beach Gardens, Florida, is the trustee of the Stephanie A. Harrold Revocable Trust ("Harrold Trust"). The Harrold Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

59.     Plaintiff Nancy Lynn Morton, a resident of Chicago, Illinois, is the trustee of the Harrold Family Dynasty Trust ("Harrold Family Dynasty Trust"). The Harrold Family Dynasty Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

60.     Plaintiff Charles Cotton Harrold IV, a resident of Palm Beach Gardens, Florida, is the trustee of the C. Cotton Harrold IV Investment Trust ("Harrold Investment Trust"). The Harrold Investment Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

61.     Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Nancy Horween Trust ("N. Horween Trust"). The N. Horween Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

62.     Plaintiff JP Morgan Trust Company of Delaware is the trustee of the Trust Under the Will of Marion E. Horween FBO Lisa Horween Kelly ("L. Horween Trust"). The L. Horween Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

63.     Plaintiff Sally Jo Morris, a resident of Chicago, Illinois, is the trustee of the Suzanne Kanis Revocable Trust ("Kanis Trust"). The Kanis Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

64.     Plaintiff Ronald D. Kaplan ("Kaplan") is an individual who resides in Studio City, California.  Kaplan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

65.     Plaintiff Michael R. Kaskie ("Kaskie") is an individual who resides in Chicago, Illinois.  Kaskie purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

66.     Plaintiff Kilrea Family Investments, LLC ("Kilrea Investments") is an Illinois limited liability company. Kilrea Investments purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

67.     Plaintiff Scott Kilrea, a resident of Hilton Head Island, South Carolina, is the trustee of the Scott Kilrea Trust U/A DTD 04/14/1997 ("Kilrea Trust"). The Kilrea Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

68.     Plaintiff Karl John Henry Koehler III ("K. Kohler") is an individual who resides in New York, New York. K. Koehler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

69.     Plaintiff Sandra Sue Koehler ("S. Kohler") is an individual who resides in New York, New York. S. Kohler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

70.     Plaintiffs Karl Henry John Koehler III and Inna Koehler, both residents of New York, New York, are the trustees of the Jay Koehler and Inna Koehler Living Trust located (collectively "Koehler Trust"). The Koehler Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

71.     Plaintiff Kreiseder Family LLC ("Kreiseder") is a Delaware limited liability company. Kreiseder purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

72.     Plaintiff LTR I LLC ("LTR") is a Delaware limited liability company.  LTR purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

73.     Plaintiff Sheffee Lulkin ("Lulkin") is an individual who resides in Skokie, Illinois. Plaintiff Shefee Lulkin & Associates, Inc. ("Lulkin & Associates") is an Illinois corporation. Lulkin and/or Lulkin & Associates purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

74.     Plaintiff John L MacCarthy, a resident of Winnetka, Illinois, is the trustee of the John Leland MacCarthy Revocable Trust ("MacCarthy Trust"). MacCarthy Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

75.    Plaintiff John D. Marschall, a resident of Port St. Lucie, Floria, is the trustee of the John D. Marschall Trust ("Marschall Trust"). The Marschall Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

76.    Plaintiff Peter J. McDonald, a resident of Lake Bluff, Illinois, is the trustee of the Peter J. McDonald Trust DTD 04/22/2010 ("McDonald Trust"). McDonald purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

77.    Plaintiff William McKenna ("McKenna") is an individual who resides in Hobe Sound, Florida.  McKenna purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

78.    Plaintiff Nancy Mengel ("Mengel") is an individual who resides in Novato, California. Mengel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

79.    Plaintiff Robert Mueckler, II ("Mueckler") is an individual who resides in Elgin, South Carolina. Mueckler purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

80.    Plaintiff Steven Patrick Nedelka ("Nedelka") is an individual who resides in Libertyville, Illinois. Nedelka purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

81.    Plaintiffs Holly Nelson-Johnson and Terry Nelson-Johson, both residents of Evanston, Illinois, are the trustees of the E. Holly Nelson-Johnson Family Irrevocable Trust (collectively "Nelson-Johnson Trust"). The Nelson-Johnson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

82.    Plaintiff Mark Ordower, a resident of Chicago, Illinois, is the trustee of the Mark Ordower Revocable Trust ("Ordower Trust"). The Ordower Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

83.    Plaintiff Ordower Investments ("Ordower Investments") is an Illinois partnership with its principal place of business in Chicago, Illinois. Ordower Investments purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

84.     Plaintiff James Papesch ("Papesch") is an individual who resides in Lake Forest, Illinois. Papesch purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

85.     Plaintiff Peer Pedersen, Jr., a resident of Chicago, Illinois, is the trustee of the Declaration of Trust of Peer Pedersen ("Pedersen DOT"). The Pederson DOT purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

86.     Plaintiff John Muehlstein, a resident of Chicago, Illinois, is the trustee of the Peer Pedersen Trust ("Pedersen Trust"). The Pedersen Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

87.     Plaintiff Barry Lance Polonitza ("Polonitza") is an individual who resides in Bonita Springs, Florida. Polonitza purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

88.     Plaintiff Ruthmarie Connor, a resident of Boulder, Colorado, is the trustee of the Rollin Polonitza Family Trust ("Polonitza Family Trust"). The Polonitza Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

89.     Plaintiff Mary Polonitza, a resident of Carlsbad, California, is the trustee of the Jard Polonitza Separate Property Trust ("Jard Polonitza Trust"). The Jard Polonitza Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

90.     Plaintiff Beri Lynn Polonitza, a resident of Boulder, Colorado, is the trustee of the Beri Lynn Polonitza Revocable Trust ("B.L. Polonitza Trust"). The B.L. Polonitza Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

91.     Plaintiff Phillip Porpora, a resident of Scottsdale, Arizona, is the trustee of the Phillip Porpora Trust ("Porpora Trust"). The Porpora Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

92.     Plaintiff Liza Reynolds Limited Partnership ("Reynolds") is an Illinois limited partnership.  Reynolds purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

93.     Plaintiff RJDC Management Company LLC ("RJDC") is an Illinois limited liability company.  RJDC purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

94.     Plaintiff Scott Anthony Ronan ("Ronan") is an individual who resides in Rochester Hills, Michigan.  Ronan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

95.     Plaintiff Jerry G. Ryder ("Ryder") is an individual who resides in Lake Bluff, Illinois.  Ryder purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

96.     Plaintiff Kimberly Seeds ("Seeds") is an individual who resides in Naples, Florida. Seeds purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

97.     Plaintiff James Sharman ("Sharman") is an individual who resides in Naples, Florida. Sharman purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

98.     Plaintiff Victoria Clewell, a resident of Lake in the Hill, Illinois, is the trustee of the Ronald J. Sloane Family Trust, which inherited the assets of an IRA established by Ronald J. Sloane ("Sloane Trust"). Mr. Sloane and/or the Sloane Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

99.     Plaintiff SSSB Partnership ("SSSB") is an Illinois partnership.  SSSB purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

100.    Plaintiff Jonathan Stulgis, a resident of Charlestown, Massachusetts, is the trustee of the Jonathan W. Stulgis Family Trust ("Stulgis Trust"). The Stulgis Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

1       101.    Plaintiff Doris J. Wik ("D.J. Wik") is an individual who resides in Farmington

2  Hills, Michigan. D.J. Wik purchased securities from and/or invested in DLIF with the amount in

3  controversy exceeding $75,000.

4       102.    Plaintiff Frances Armour Williamson, a resident of Charlotte, North Carolina, is

5  the trustee of the Frances Armour Williamson TTEE Revocable Trust of Frances Armour

6  Williamson ("Williamson Trust"). The Williamson Trust purchased securities from and/or

7  invested in DLIF with the amount in controversy exceeding $75,000.

8       103.    Plaintiff Yiming Zhang ("Zhang") is an individual who resides in Chicago,

9  Illinois.  Zhang purchased securities from and/or invested in DLIF with the amount in controversy

10 exceeding $75,000.

11      104.    Plaintiff Stephen Jay Akana ("Akana") is an individual who resides in Berkeley,

12 California. Akana purchased securities from and/or invested in DLIF with the amount in

13 controversy exceeding $75,000.

14      105.    Plaintiffs Harminder Brar and Pearlene Brar, both residents of Anaheim,

15 California, are the trustees of the Brar Family Trust (collectively "Brar Trust"). The Brar Trust

16 purchased securities from and/or invested in DLIF with the amount in controversy exceeding

17 $75,000.

18      106.    Plaintiff Robert Brilliant, a resident of San Mateo California, is the trustee of the

19 Brilliant Family Trust ("Brilliant Family Trust"). The Brilliant Family Trust purchased securities

20 from and/or invested in DLIF with the amount in controversy exceeding $75,000.

21      107.    Plaintiff Jerome Yap Chua ("Chua") is an individual who resides in Danville,

22 California. Chua purchased securities from and/or invested in DLIF with the amount in

23 controversy exceeding $75,000.

24      108.    Plaintiff Orla Cunningham, LLC ("Orla") is a California limited liability company.

25 Orla purchased securities from DLIF in the principal amount of $260,956.21.

26      109.    Plaintiff Barry P. Garrison, a resident of Madera, California, is the trustee of the

27 Barry P. Garrison ("Garrison Trust"). The Garrison Trust purchased securities from and/or

28 invested in DLIF with the amount in controversy exceeding $75,000.

110.   Plaintiff Eugene Goebel ("E. Goebel") is an individual who resides in Pismo Beach, California. E. Goebel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

111.   Plaintiff Jessa Ann Goebel ("J. Goebel") is an individual who resides in El Dorado Hills, California. J. Goebel purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

112.   Plaintiff Stephanie Marie Grein ("Grein") is an individual who resides in San Francisco, California. Grein purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

113.   Plaintiffs Brent Horowitz and Heather Thompson, both residents of Corte Madera, California, are the trustees of the Horowitz Family Trust (collectively "Horowitz Trust"). The Horowitz Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

114.   Plaintiff Julie Lewis ("Lewis") is an individual who resides in Longmont, Colorado. Lewis purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

115.   Plaintiff Stacy K. Li ("Li") is an individual who resides in Santa Rosa, California. Li purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

116.   Plaintiff Ronald McLeod, a resident of Pleasanton, California, is the trustee of the Ronald McLeod Revocable Trust ("McLeod Trust"). The McLeod Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

117.   Plaintiff John D. Michael ("J.D. Michael") is an individual who resides in San Rafael, California. J.D. Michael purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

118.   Plaintiff Daniel Michael and Lillian Leong, both residents of Walnut Creek, California, are the trustees of the Michael Leong Family Trust DTD 08/13/2013 ("Michael

Trust"). The Michael Leong Family Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

119.   Plaintiff Jennifer Mvongo, a resident of San Diego, California , is the trustee of the Jennifer M. Mvongo Revocable Trust ("Mvongo Trust"). The Mvongo Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

120.   Plaintiffs Ramesh Patel and Alison Patel, both residents of Mill Valley, California, are the trustees of the R. Patel and A. Patel TTEE, KENEW DBP U/A DTD 12/31/2016 (collectively, the "Patels"). The Patels purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

121.   Plaintiff David Malcolm Potts ("Potts") is an individual who resides in Berkeley, California. Potts purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

122.   Plaintiff Thomas F. Reiser, Jr. ("Reiser") is an individual who resides in Alamo, California. Reiser purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

123.   Plaintiff James E. Salter ("Salter") is an individual who resides in San Ramon, California. Salter purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

124.   Plaintiff Ridge Sampson, a resident of Mill Valley, California, is the trustee of the Ridge Sampson Revocable Trust ("Sampson Trust"). The Sampson Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

125.   Plaintiff Aaron Michael Silva ("Silva") is an individual who resides in Dallas, Texas. Silva purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

126.   Gerald Guy Stokes, Jr. ("Stokes") is an individual who resides in San Mateo, California. Stokes purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

127.    Plaintiff Max Luis Tejada ("Tejada") is an individual who resides in Carlsbad, California. Tejeda purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

128.    Plaintiff Trinh-Mai N. Vo ("Vo") is an individual who resides in Dublin, California. Vo purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

129.    Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona. Walberg purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

130.    Plaintiff Michael Witlin ("Witlin") is an individual who resides in Lafayette, California. Witlin purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

131.    Plaintiff Bennet Woodward ("Woodward") is an individual who resides in Cardiff by the Sea, California. Woodward purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

132.    Plaintiffs Dimitri Katamanin, individually and as the trustee of the Four Season's Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

133.    Plaintiff Sameer Kero, a resident of Chicago, Illinois, is the trustee of the Flexedge Investment Management Defined Benefit Pension Plan & Trust ("Flexedge Trust"). The Flexedge Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

134.    Plaintiff Sameer Kero ("S. Kero") is an individual who resides in Chicago, Illinois. S. Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

135.    Plaintiff Chanda Mehta Kero ("C. Kero") is an individual who resides in Chicago, Illinois. C. Kero purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

1   136.   N. Kero Investments, LTD., LLLP ("Kero Investments") is an Illinois limited

2   liability limited partnership with its principal place of business in Chicago, Illinois. Kero

3   Investments purchased securities from and/or invested in DLIF with the amount in controversy

4   exceeding $75,000.

5   137.   Plaintiff S. Kero Limited Partnership ("Kero LP") is a Florida limited partnership

6   with its principal place of business in Brooksville, Florida.  Kero LP purchased securities from

7   and/or invested in DLIF with the amount in controversy exceeding $75,000.

8   138.   Plaintiff Niloufer Kero ("Niloufer Kero") is an individual who resides in

9   Springhill, Florida. Niloufer Kero purchased securities from and/or invested in DLIF with the

10   amount in controversy exceeding $75,000.

11   139.   Plaintiff Niloufer Kero, a resident of Springhill, Florida, is the trustee of Niloufer

12   Kero Revocable Family Trust ("Niloufer Kero Trust"). The Niloufer Kero Trust purchased

13   securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

14   140.   Plaintiff Shawkat Kero ("Shawkat Kero") is an individual who resides in Jersey

15   City, NJ.  Shawkat Kero purchased securities from and/or invested in DLIF with the amount in

16   controversy exceeding $75,000.

17   141.   Plaintiff Sarita Mehta ("Mehta") is an individual who resides in Chicago, Illinois.

18   Mehta purchased securities from and/or invested in DLIF with the amount in controversy

19   exceeding $75,000.

20   142.   Plaintiff Narendrakumar & Smita Mehta Joint ("N&S Mehta") are individuals who

21   reside in Hoffman Estates, Illinois. N&S Mehta purchased securities from and/or invested in

22   DLIF with the amount in controversy exceeding $75,000.

23   143.   Plaintiff Pareshkumar Desai ("Pareshkumar Desai") in an individual who resides

24   in Crystal River, Florida. Pareshkumar Desai purchased securities from and/or invested in DLIF

25   with the amount in controversy exceeding $75,000.

26   144.   Plaintiffs Etienne Boillot, a resident of Mamaroneck, New York, and Stuart E.

27   Lucas, a resident of Chicago, Illinois, are the trustees of the GST Trust.  GST Trust purchased

28   securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

145.     Plaintiff Anthony V. Dub ("Dub") is an individual who resides in New York, New York.  Dub purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

146.     Plaintiff Michael Driscoll ("M. Driscoll") is an individual who resides in Louisville, Kentucky.  M. Driscoll purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

147.     Plaintiffs Neal Driscoll and Alia Driscoll (the "Driscolls") are individuals who reside in Bozeman, Montana.  The Driscolls purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

148.     Plaintiff Dennis J. FitzSimons ("FitzSimons") is an individual who resides in Naples, Florida. FitzSimons purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

149.     Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, Soyla V. Rausch are the trustee for the Carrie G. Cox TUW Tr. B FBO Mary Hancock ("First Hancock Trust").  The First Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

150.     Plaintiffs U.S. Bank N.A., a national association incorporated in Delaware, and Soyla V. Rausch are the trustee for the Harriet C. Collis TUA Tr. B FBO Mary Hancock ("Second Hancock Trust"), is domiciled in Naples, Florida.  The Second Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

151.     Plaintiff, William Wayne Hancock III, a resident of Louisville, Kentucky, is the trustee of the George B. Hancock Trust ("G.B. Hancock Trust"). The G.B. Hancock Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

152.     Plaintiffs John Vance Hancock and Nancy A.D. Hancock (the "Hancocks") are individuals who reside in Easton, Connecticut. The Hancocks purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

153.     Plaintiff Michael Harrigan ("Harrigan") is an individual who resides in Tequesta, Florida. Harrigan purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

154.     Plaintiff Michael Harrigan, a resident of Tequesta, Florida, is the trustee for the Michael J. Harrigan Trust ("Harrigan Trust"). The Harrigan Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

155.     Plaintiff John H. Heuberger, a resident of Westminster, Colorado, is the trustee of the WBK 2012 Trust ("WBK Trust"). The WBK Trust purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

156.     Plaintiff Loeb Holding Corporation ("Loeb") is a New York corporation with its principal place of business in New York, New York.  Loeb purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

157.     Plaintiff Armando Pauker ("Pauker") is an individual who resides in Glenview, Iliniois. Pauker purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

158.     Plaintiff SAS ARDIS ("SAS ARDIS") is a foreign holding company, in which David Spector invested. SAS ARDIS purchased securities from and/or invested in DLIF and/or DLIFF with the amount in controversy exceeding $75,000.

159.     Plaintiff Vasundhara Tolia ("V. Tolia") is an individual who resides in Bloomfield Hills, Michigan.  V. Tolia purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

160.     Plaintiff Osman Uslu ("Uslu") is competent adult.  Uslu purchased securities from and/or invested in DLIF and/or DLIFF with the amount in controversy exceeding $75,000.

161.     Plaintiff Bret M. Walberg ("Walberg") is an individual who resides in Goodyear, Arizona.  Walberg purchased securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

1       162.    Plaintiff Shai Wininger a.k.a. Shay Wininger ("Wininger") is an individual who

2   resides in Haifa, Israel. Wininger purchased securities from and/or invested in DLIF and/or

3   DLIFF with the amount in controversy exceeding $75,000.

4       163.    Plaintiffs Philip Nadel and Blair Ambach ("Nadal/Ambach") are individuals who

5   reside in Boca Raton, Florida, and Plaintiff Chancellor Capital is a Florida limited liability

6   company (collectively, "Nadal/Ambach/Chancellor"). Nadal/Ambach/Chancellor purchased

7   securities from and/or invested in DLIF with the amount in controversy exceeding $75,000.

8       164.    Plaintiff Sanjay Tolia ("S. Tolia") is an individual who resides in Manhattan

9   Beach, California. S. Tolia purchased securities from and/or invested in DLIF with the amount in

10   controversy exceeding $75,000.

11       165.    Plaintiff Vinay Tolia, a resident of Miami, Florida, is the trustee of Sanjay Tolia

12   2014 Annuity Trust ("S. Tolia Trust"). The S. Tolia Trust purchased securities from and/or

13   invested in DLIF with the amount in controversy exceeding $75,000.

14       166.    Plaintiff Jerry G. Ryder ("Ryder") is an individual who resides in Lake Bluff,

15   Illinois.  Ryder purchased securities from and/or invested in DLIF with the amount in controversy

16   exceeding $75,000.

17                           **GENERAL ALLEGATIONS**

18     **Backround:**

19       167.    DLIF was organized as a Delaware limited partnership in September 2012 to

20   operate as a private investment partnership. DLI was the general partner of DLIF and acted as the

21   limited partnership's investment advisor. DLI was headquartered in Glendale, California. Ross

22   was the founder, 100% owner, managing member and CEO of DLI.

23       168.    Through December 2015, DLIF's private placement memoranda ("PPMs") and

24   monthly letters sent to investors described DLIF's investment strategy as designed to earn double

25   digit returns in the 10%-14% range through the purchase of short-term loans originated by other

26   lending platforms, such as IOU Central, Dealstruck, Quarterspot and Loan Hero.[2] These PPMs

27

28   [2] As detailed further below, Ross secretly held ownership interests in a number of the loan counterparties, including Dealstruck, Quarterspot and Loan Hero.

1  and investor letters emphasized the loans DLIF purchased: (a) were issued by qualified,

2  established U.S. based businesses, and/or individuals with high FICO scores; (b) had short terms

3  of less than 18 months; (c) were fully amortizing; (d) were guaranteed by the borrowers; and (e)

4  were secured by the assets of the borrower.

5      169.    The PPMs also emphasized that investors were not restricted by any lock-up

6  period and would have monthly liquidity (with redemptions allowed on 35 days notice). DLIF

7  theoretically was able to provide this liquidity because its held a large number of small loans with

8  short maturity, thus giving DLIF sufficient liquidity to cover investor withdrawal requests if

9  necessary. Liquidity in a fund is a strong selling point.

10      170.    As late as November 2015, Ross communicated to investors in his monthly

11  newsletter that "we start Q4 of 2015 with no changes to our current strategy: 1. Buy loans issued

12  to established, local businesses from multiple online lenders. 2. Maintain unlevered, double-digit,

13  investment returns."

14      171.    However, under EisnerAmper's watch and without notice to its investors, in late

15  2014 and throughout 2015, DLI's investment strategy shifted to setting up large financing

16  structures with other lending platforms that purportedly paid a fixed return on the investment.

17  DLI also began lending large sums to two newly formed platforms (Talking Capital and VoIP

18  Guardian), who themselves loaned money to two highly suspect "Tier 3" foreign telecom

19  companies. These changes fundamentally altered the nature of Plaintiffs' investment and

20  increased risk by (a) concentrating risk and (b) reducing liquidity. In effect, DLIF became a new

21  investment once it started investing large sums into lending platforms and other credit providers,

22  rather than holding a number of small notes.

23      172.    The shift in investment strategy was memorialized in a December 2015 PPM,

24  which disclosed for the first time that the fund was shifting from investing directly in small, short

25  term loans to creditworthy borrowers to investing in "non-bank lenders." In truth, however, DLI

26  shifted to this alternative investment strategy over a year earlier. EisnerAmper failed to disclose

27  in its 2015 audit that DLI had fundamentally altered its investment strategy long before the

28

1    December 2015 PPM was circulated, thereby using investor funds for purposes that were neither

2    authorized nor disclosed.

3        173.    Furthermore, under EisnerAmper's watch, DLI invested heavily in lending

4    platforms in which Ross owned an interest. Such related-party transactions demanded heightened

5    scrutiny from EisnerAmper. In fact, Ross used these related party transactions to manipulate

6    "repayment" evidence on DLI's loans, thus artificially inflating DLIF's NAV by concealing the

7    true default rate on its assets.

8        174.    On the foundation EisnerAmper's clean audits verifying DLI's valuation methods

9    and consistent monthly returns, Ross was able to grow his Ponzi scheme from just over $16

10   million in investments at the end of 2013 to nearly $800 million at the end of 2018, including

11   over $103 million invested by Plaintiffs.

12       175.    On February 11, 2019, DLI sent a letter to each of the Funds' investors

13   announcing that the Funds had suspended withdrawals and redemptions. The letter further

14   announced that one of DLI's major counterparties, VoIP Guardian, had stopped making interest

15   payments on $160 million borrowed from DLI, and that DLI "suspects that the cessation of

16   payments (was) the likely result of misconduct . . . and that a substantial portion of the $160

17   million may not be recoverable."

18       176.     On March 22, 2019, the SEC filed a fraud action against DLI in federal court in

19   Los Angeles alleging violations of various federal securities laws, including Sections 206(1) and

20   206(2) of the Investment Advisors Act of 1940, Section 10(b) of the Exchange Act and Rule

21   10(b)(6), and Section 17(a) of the Securities Act, charging that DLI had fraudulently overvalued

22   DLIF's assets (and those of a second foreign feeder fund created after EisnerAmper's tenure,

23   DLIFF) to induce investments and extract excess management fees.[3]

24       177.    On April 1, 2019, DLI, DLIF, and other affiliated entities were placed into

25   receivership and a permanent receiver was appointed.

26       178.    On August 11, 2020, Ross was arrested following a grand jury indictment on ten

27   counts of wire fraud. The indictment charged that "beginning no later than in or about December

28   
_____

[3] *SEC v. Direct Lending Invs., LLC,* No. 2:19-cv-02188-DSF-MRW (C.D. Cal.) (Fischer, J.).

2013, and continuing to in or about March 2019 . . . Ross, and others known and unknown to the Grand Jury, knowingly with the intent to defraud, devised, participated in and executed a scheme to defraud the funds [and] their investors . . . as to material matters, and to obtain money and property from the victims by means of material facts and fraudulent pretenses, representations and promises, and the concealment of material facts." The indictment further alleged Ross caused "monthly assets values to be cumulatively inflated by over $300 million."

179.    On August 11, 2020, the SEC filed a civil enforcement action against Ross, alleging an intricate, multi-year effort by Ross to fraudulently inflate the value and returns for investment positions held by the funds.[4] The SEC alleged that Ross orchestrated a scheme whereby DLIF counterparty Quarterspot would make "rebate" payments to the fund in order to give the false impression that borrowers were making principal payments on delinquent loans, and that under DLI's valuation policy, these non-performing loans should have been marked down 50% or 100% and reserved against the Funds' interest income. Instead the loans were valued at par because of the false payments Ross engineered.

180.    DLI's fraudulent conduct involved more than Quarterspot, and included: (a) pervasive fraud and misrepresentations to investors since inception; (b) accounting records and account statements delivered to investors that misrepresented income, valuation of assets and net worth as well as overstated asset values; (c) an aggregate underreported allowance for bad debt expense of $501.4 million due to the overstated nature of the loan portfolio and generally high risk investments, many of which varied from the type and nature of investments promised to investors; (d) a total of $647 million that was loaned to counterparties in which Ross had or may have had a financial interest; and (e) a bad debt expense of $343.7 million relative to the obligations of these related loan counterparties.[5]

181.    Because all of DLI's assets were "Level 3" assets, meaning they were illiquid and could not be valued through market prices or other observable metrics, proper valuation of its

---

[4] *SEC v. Ross*, No. 2:20-cv-07202 (C.D. Cal.) (Fischer, J.).
[5] *See generally* Receiver's Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distribution – *Securities and Exchange Commission v. Direct Lending Investments, LLC,* C.D. Cal. Case No. 2:19-cv-02188-DSF-MRW, Dkt. No. 320.

1    assets was critical to understanding DLI's financial health. Thus, properly testing DLI's valuation

2    methodology was central to EisnerAmper's work as auditor — work it did not perform.

3          **EisnerAmper's Engagements:**

4          182.    EisnerAmper served as DLIF's independent auditor for the fiscal years ending

5    December 31, 2014 and December 31, 2015. In addition, EisnerAmper drafted a new audit for

6    fiscal year ending December 31, 2013, even though an audit had previously been prepared by its

7    predecessor, the national auditing firm BDO. Notably, EisnerAmper did not disclose its 2013

8    audit as a "restated" audit, nor did it disclose the differences between its audit and BDO's audit or

9    the reasons for redoing the audit; both failures were a breach of applicable accounting standards.

10   EisnerAmper also re-issued a year-end 2014 audit in connection with DLI's N2 registration with

11   the SEC. The 2013 restated audit, which was issued as a combined audit with the 2014 audit on

12   July 1, 2015, is attached hereto as Exhibit 1. The year-end 2014 audit issued and submitted to the

13   SEC on December 28, 2015 (but not circulated to investors) is attached hereto as Exhibit 2. The

14   2015 audit, which was issued on June 23, 2016, is attached hereto as Exhibit 3.

15         183.    On January 8, 2015, EisnerAmper and DLIF signed their first engagement letter

16   and, among other things, agreed: "[EisnerAmper] will audit the statement of assets and liabilities

17   of the Fund as of December 31, 2014 and 2013, including the schedule of investments and

18   retained statement of operations, changes in partners' capital, cash flows for the years then ended.

19   Based on our audit, we will issue a written report on the Fund's financial statement and schedules

20   supporting the financial statements (if required), all of which are to be included in the Funds

21   initial registration statement (Form N-2) proposed to be filed under the rules prescribed by the

22   Securities and Exchange Commission."

23         184.    On January 8, 2016, EisnerAmper and DLIF signed an engagement agreement to

24   "audit the statement of assets and liabilities of the Fund as of December 31, 2015, including the

25   schedule of investments and retained statement of operations and cash flows for year then ended,

26   and the statement of changes in partners' capital for each of the two years in the period then

27   ended, and the related notes to the financial statements."

28

185.   The written objective of each audit was "the expression of an opinion about whether the Fund's financial statements are fairly presented, in all material respects, in conformity with principles generally accepted in the United States of America ('GAAP')."

186.   EisnerAmper agreed as part of each engagement that it "was responsible for conducting our audit of the financial statement in accordance with the standards established by the Public Fund Accounting Oversight Board (United States) ('PCAOB')." Adoption of PCAOB standards — amongst the most stringent auditing standards — provided extra comfort to DLI's investors.

187.   EisnerAmper also consented to DLI's identification of EisnerAmper as its auditor in marketing and informational materials sent to investors and prospective investors.

188.   A Private Placement Memorandum was prepared by DLI upon EisnerAmper's retention in January 2015 ("January 2015 PPM"). On information, investigation and belief, EisnerAmper consented to be identified and was identified as DLIF's auditor in the January 2015 PPM. Between January 8, 2015 and December 2015, the January 2015 PPM identifying EisnerAmper as DLIF's auditor was provided to every prospective investor and every existing investor in DLIF, including Plaintiffs herein. In addition, the January 2015 PPM identifying EisnerAmper as DLIF's auditor was provided to the RIA of each prospective and existing investor represented by an RIA.

189.   A new PPM was prepared by DLI in December 2015 ("December 2015 PPM"), which disclosed to investors for the first time a fundamental shift in DLI's investment strategy, moving from making direct investments in small, short term loans to funding "non-bank lenders." On information, investigation and belief, EisnerAmper consented to be identified and was identified as the auditor of DLIF in the December 2015 PPM, thus providing assurance to investors that the fund had already retained well-renowned auditor. Between December 2015 and September 2016 (when Deloitte replaced EisnerAmper), the December 2015 PPM identifying EisnerAmper as DLIF's auditor was provided to every prospective investor and every existing investor in DLIF, including Plaintiffs herein. In addition, the December 2015 PPM identifying

EisnerAmper as DLIF's auditor was provided to the RIA of each prospective and existing investor represented by an RIA.

190.     On information, investigation, and belief, between January 8, 2015 and September 30, 2016, EisnerAmper consented to and was identified as DLIF's auditor in all marketing materials sent to prospective and existing investors, including Plaintiffs and the RIAs.

191.     On or about July 1, 2015, EisnerAmper's combined 2013 and 2014 audit was provided to each Plaintiff (and their RIAs) who had invested as of July 1, 2015. After July 1, 2015, EisnerAmper's combined 2013 and 2014 audit was provided to every prospective investor in the Funds (and their RIAs), including Plaintiffs who invested after said date.

192.     On or about June 23, 2016, EisnerAmper's 2015 audit was provided to each Plaintiff (and their RIAs) who had invested as of June 23, 2016. After June 23, 2016, EisnerAmper's 2015 audit was provided to every prospective investor in the Funds (and their RIAs), including Plaintiffs who invested after the date.

193.     Even though some Plaintiffs invested in the Funds before EisnerAmper became auditor, they and/or their RIAs (or other investment advisor(s)) relied on EisnerAmper in deciding to keep their investments in DLIF after review EisnerAmper's audits of DLIF's financial statements.

194.     Plaintiffs who purchased after EisnerAmper became auditor, and their RIAs (or other investment advisor(s)), performed due diligence on the Funds before investing, including review of the financial statements audited by EisnerAmper, as well as ongoing due diligence after purchase. EisnerAmper's clean audits of DLIF's financial statement were material to each of these Plaintiffs' decision to invest in and continue their investments in DLIF.

**EisnerAmper's Responsibilities as Auditor:**

195.     The American Institute of Certified Public Accountants ("AICPA") is the organization that develops and establishes professional standards and defines an auditor's responsibilities when auditing financial statements.

196.    The AICPA issues detailed interpretations of GAAS rules and auditor responsibilities through the Statements of Accounting Standards codified into AU sections ("AU"). *See* AU-C §§ 200.01, 200.02.

197.    As an independent auditor, EisnerAmper had to adhere to the rules and regulations promulgated by the AICPA in auditing DLIF's financial statements, including the following:

i.    "An auditor conducting an audit in accordance with GAAS is responsible for obtaining reasonable assurance that the financial statements as a whole are free from material misstatement, whether caused by fraud or error." AU-C § 240.05. The EisnerAmper engagement letters describe "reasonable assurance" as "a high level of assurance."

ii.    "The auditor should perform risk assessment procedures to provide a basis for the identification and assessments of risks of material misstatement at the financial and relevant assertion levels." AU-C § 315.05.

iii.    In evaluating and assessing the risks of material misstatements [in financial statements], as required by [AU-C § 315] the auditor should evaluate the degree of estimation uncertainty associated with accounting estimates and determine whether, in the auditor's professional judgment, any of those accounting estimates that have been identified as having high estimation uncertainty give rise to significant risks. AU-C § 540.10-11.

iv.    Because related parties are not independent of each other, financial reporting frameworks establish specific accounting and disclosure requirements for related party relationships, transactions, and balances to enable users of the financial statements to understand their nature and actual or potential effects on the financial statements. Therefore, the auditor has a responsibility to perform audit procedures to identify, assess and respond to the risks of material misstatement arising from the entity's failure to appropriately account for or disclose related party relationships,

1       transactions or balances. *See* PCAOB AS 2410 (Related Parties); *see also*

2       AU-C § 334.

3   v.      "When using external confirmation procedures, the auditor should maintain

4       control over external confirmation requests, including: a. determining the

5       information to be confirmed or requested; b. selecting the appropriate

6       confirming party; c. designing the confirmation requests are properly

7       directed to the appropriate confirming party and provide for being

8       responded to directly to the auditor; and d. sending the requests, including

9       follow-up requests, when applicable to the confirming party." AU-C §

10      505.07.

11  vi.     "If the auditor has determined that a written response to a positive

12      confirmation request is necessary to obtain sufficient appropriate audit

13      evidence, alternative audit procedures will not provide the audit evidence

14      the auditor requires. If the auditor does not obtain such confirmation, the

15      auditor should determine the implications for the audit and auditor's

16      opinion, in accordance section 705." AU-C § 505.13.

17  vii.    "The auditor should modify in the auditor's report when a. the auditor

18      concludes that based on the audit evidence obtained, the financial

19      statements as a whole are materially misstatement or b. the auditor is

20      unable to obtain sufficient audit evidence to conclude that the financial

21      statements as a whole are free from material misstatement." AU-C §

22      705.07.

23  198.    By adhering to the above-referenced rules and regulations, an independent auditor

24  furthers its multiple objectives to, among other things:

25  i.      "Obtain sufficient appropriate audit evidence regarding the a. valuation of

26      investments in securities and derivative instruments; b. existence and

27      condition of inventory; c. completeness of litigation, claims, and

28      assessments involving the entity; and d. presentation and disclosure of

1    segment information, in accordance with the applicable financial reporting

2    framework." AU-C § 501.03

3        ii.    "Obtain sufficient appropriate audit evidence about whether, in the context

4    of the applicable financial reporting framework a. accounting estimates,

5    including fair value accounting estimates, in the financial statements,

6    whether recognized or disclosed, are reasonable and b. related disclosures

7    in the financial statements are adequate." AU-C § 540.06.

8        199.    The Public Company Accounting Oversight Board ("PCAOB") is charged with

9    overseeing the auditing of public companies and adopting standards related to auditing, quality

10   control, ethics, independence and other standards regarding auditing (and by which standards

11   EisnerAmper agreed to in conducting the Audits), and has stated that "[f]or specifically

12   identified risks of material misstatement due to fraud, such as significant related-party

13   transactions not in the ordinary course of business, the auditor generally responds by changing

14   the nature, timing and/or extent of auditing procedures." PCAOB Rel. 2007-001 at 5-6. (Jan. 22,

15   2007) (citing AU-C § 316.52); *see also* AU-C § 330.06-07 (Dec. 15, 2012).

16       200.    The PCAOB further requires auditors to test, and to document their testing of,

17   management's assumptions and other aspects of financial statement issuers' accounting

18   estimates, such as estimations of Level 3 asset values. PCAOB Rel. 2007-001, at 10. *See also*

19   AU-C § 540.06.

20       201.    EisnerAmper had to follow GAAS and other applicable standards and obtain

21   evidence supporting the valuation of DLIF investments in DLIF's financial statements.

22       202.    EisnerAmper was also required to perform its Audits with due care, professional

23   skepticism, and in a manner sufficient to address the existence of and disclosure requirements for

24   related party transactions.

25       203.    EisnerAmper further agreed in its engagement letters that:

26   "Our audit of the Financial statements will include tests of the documentary evidence
     supporting the transactions recorded in the accounts, including direct confirmation of
27   certain assets and liabilities by correspondence with selected customers, creditors and
     financial institutions."
28

"An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management."

"Our audit of the financial statements will also include reading the other information in the Funds annual report and considering whether other information in the annual report ... is materially inconsistent with information in the financial statements."

"We are also required to read any document ... that contains or incorporates by reference our annual report, or contains any reference to us."

204.    EisnerAmper regularly met, spoke and corresponded with DLIF about operations, transactions, business structures, accounting policies and other issues relevant to DLIF's financial statements; had access to internal corporate data and reports; and had the opportunity to test DLI's financial statements and internal controls.

205.    In each of its audits EisnerAmper stated that: (a) it believed its auditing work provided a reasonable basis for its opinion; (b) the financial statements subject to the Audit were prepared in conformity with GAAP; (c) the financial statements subject to the Audit were free of material misstatement; (d) the financial statements subject to Audit presented fairly, in all material respects, the financial position and results of operations and cash flows of DLIF as of December 31 of the relevant year; and (e) the Audits were performed in compliance with GAAS.

206.    As described below, these statements were false.

**2013 Audit - Restated by EisnerAmper:**

207.    EisnerAmper's 2013 audit was crafted to conceal a prior audit performed by BDO with an "Emphasis of Matter" that was a warning sign to potential investors.

208.    BDO's 2013 audit of DLIF included a prominent "Emphasis of Matter" in relation to its opinion:

"At December 31, 2013 Direct Lending Income Fund, LP held investments in non-marketable business notes ('Notes'). The fair values of the Notes have been estimated by Direct Lending Investments, LLC ('General Partner') in the absence of observable inputs as defined by Accounting Standards Codification Topic 820, 'Fair Value Measurement'. Those estimated fair values may differ significantly from the values that would have been used had a ready market for the Notes existed, and the differences could be material to the financial statements."

209.    Ross feared the Emphasis of Matter would dissuade investment in his nascent fund.

210.   In order to improve the chances of securing additional investors, Ross shopped for an auditor to draft a new 2013 audit without an emphasis of matter and help conceal the 2013 audit authored by BDO.

211.   EisnerAmper obliged. On January 8, 2015, EisnerAmper was engaged as auditor for DLIF. EisnerAmper authored a new 2013 audit (combined with the 2014 audit), yet never disclosed in its audit that it was restating BDO's audit, nor disclosed the differences between its audit and BDO's audit. Ex. 1.

212.   Authoring a new audit and replacing a prior auditor's work without identifying the new audit as "restated" is a flagrant departure from GAAS and other applicable professional standards. EisnerAmper's acquiescence in Ross's auditor shopping reveals EisnerAmper's active participation in assisting DLI with concealing information about the integrity of DLI's accounting and its questionable valuation assumptions used to overstate investor principal in and income derived from the partnership.

213.   Furthermore, any auditor who is asked to re-author a prior-year audit must be appropriately skeptical that the client is "auditor shopping," i.e. searching for an auditor who will provide a desired opinion (which BDO did not, as it placed an "Emphasis of Matter" in its opinion, and utilized a significantly higher discount rate). Thus, EisnerAmper should have been skeptical about the integrity of DLIF's finances from the start, as DLIF's solicitation of the engagement itself raised a significant red flag regarding DLI and Ross's integrity.

214.   Ross's justification for needing to switch auditors does not withstand minimal scrutiny. On or about November 21, 2014, Ross was introduced to Hiren Modi ("Modi"), a senior level partner at EisnerAmper. An email dated December 12, 2014 from a potential investor that was forwarded to Ross suggested that "BDO resigned Direct Lending," to which Ross responded: "They (BDO) don't want to go through the '40 Act process. They really don't have experience with level 3 assets within public structure. It was pretty mutual." As a national and prominent accounting firm, BDO is capable of valuing Level 3 assets — it is a core function of virtually any national auditing firm's work.

215.   Before accepting the DLI engagement, EisnerAmper was required by applicable auditing standards to inquire of BDO as to the reasons it was no longer engaged by DLIF.

216.   Specifically, EisnerAmper had to make specific and reasonable inquiry of BDO regarding matters that would assist it in determining whether to accept the engagement. And, BDO was further required to respond promptly and fully, on the basis of known facts, to EisnerAmper's reasonable inquiries. *See* AU-C § 510; PCAOB AS 2610.09.

217.   Matters subject to inquiry should have included: (a) information that might bear on the integrity of management; (b) disagreements with management as to accounting principles, audit procedures or similarly significant matters; (c) communications to audit committees or others with equivalent authority and responsibility regarding fraud, illegal acts by clients and internal control related matters; (d) the predecessor auditor's understanding as to the reasons for the change in auditors; and (e) the predecessor auditor's understanding of the nature of the company's relationships and transactions with related parties and significant unusual transactions. *See id.*

218.   On investigation, information and belief, EisnerAmper did not contact BDO to inquire into why BDO had ended its engagement with DLI before agreeing to become successor auditor on January 8, 2015.

219.   Despite BDO's inclusion of the "Emphasis of Matter" identifying the significant risk of material overvaluation of DLIF's Level 3 assets in its 2013 audit, EisnerAmper did not include an "Emphasis of Matter" or any other qualification to the clean opinions it issued for 2013, 2014 and 2015, despite no changes having been made to DLI's valuation methodology.

220.   Further, despite BDO's clear warning that DLIF's valuation of its Level 3 assets may be "significantly different" from the fair value of those assets if there were clear inputs to determine the value of DLIF's holdings, EisnerAmper failed to obtain sufficient audit evidence to adequately test even DLIF's deficient valuation methodology. This, despite the fact that EisnerAmper promised in its engagement that it would "evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management."

1    221.    EisnerAmper exacerbated the overvaluation of DLIF's assets by inexplicably

2    changing the discount rate used by DLI management from the range in BDO's 2013 audit

3    (27.8% to $38.9%) to a single discount rate of 17% across all categories in its 2014 audit. This

4    unsupported lowering of the discount rate had the desired effect, i.e. increasing the value of

5    DLIF's assets. The lower and single discount rate provided by DLI management to EisnerAmper

6    for the restated 2013/2014 audit was unsupported by any reliable evidence; yet EisnerAmper

7    simply rubber-stamped DLI's new discount rate.

8    **2014 Audit by EisnerAmper:**

9    222.    EisnerAmper's 2014 audit contained a myriad of deficiencies, all of which meant

10   that EisnerAmper's clean audit opinion was mistated. EisnerAmper failed to note the

11   significance of $7 million in loans to "Talking Capital Partners I" and another $4.46 million

12   worth of loans to "Talking Capital Partners II"; failed to obtain reasonable confirmation and

13   evidence of DLI's underlying assets (namely, its loans); failed to adequately test DLI's valuation

14   methodology of its assets; failed to disclose Ross's related party interests with a number of

15   DLI's counterparties and lending platforms through which DLI obtained loans; and failed to

16   disclose that DLI was required to be registered as an investment advisor in California but was

17   unlicensed.

18   *Talking Capital*

19   223.    When EisnerAmper became DLIF's auditor, DLIF had already entered into its first

20   two transactions with Talking Capital, LLC and related entities (collectively, "Talking Capital"),

21   a company formed by Brad Reifler and Rodney Omanoff in 2014.

22   224.    On October 1, 2014 "Talking Capital Partners I, LLC" borrowed $3,500,000 from

23   DLIF for three months at an interest rate of 17%, payable in arrears "each month following

24   October, November and December 2014." The October 1, 2014 loan was "due and payable in

25   full on January 2, 2015."

26   225.    Collectively, these loans were over fourteen times the size of DLI's other largest

27   loan, and were over one hundred times the size of DLI's average loan. The size of the loans, as

28   well as the fact that they were not consistent with DLI's purported business strategy of making

short term loans to established businesses, required EisnerAmper to review the loans and perform adequate diligence on the creditworthiness of Talking Capital. The loans were also contrary to DLI's professed business strategy of acquiring small, short term loans with established businesses.

226. Nevertheless, on November 10, 2014, DLIF loaned Talking Capital Partners I an additional $3,500,000. The Promissory Note and Security Agreement documenting this second loan contain obvious indicia of fraud. For instance, the Promissory Note itself is simply a redlined version of another note dated September 2014, with the "redline" strikethroughs still included on the executed copy. The related Security Agreement is a similar redline from a September 2014 agreement, but is blank as to the telecom receivable purporting to secure the note, i.e., there was no factoring agreement even identified as the collateral for the second Talking Capital Partner I note.

227. In addition, the cover email from Ross to Brad Reifler reveals that Talking Capital had already defaulted on the first loan by failing to pay the very first interest payment due on November 1, 2014: "If you [Reifler] can wire the $49,584.50 tomorrow on the first loan, that would be helpful for me and much easier for Opus [DLIF's fund administrator] to understand than modifying the agreement to push interest off another month, which does not have the right optics."

*Shortly thereafter, DLIF loaned another $4.46 million to "Talking Capital Partners II"*

228. The significance of DLI's loans to Talking Capital was not lost on EisnerAmper. EisnerAmper clearly understood that because of the size of the Talking Capital loans compared to typical loans on DLI's books, as well as the change in business focus, they required a separate line item on DLI's balance sheet as well as a separate discussion in the notes of DLI's financials.

229. On March 3, 2015, Brett Swanson, the Financial Reporting Manager for DLIF's fund administrator at Opus Fund Services, wrote an email to Maria Larsen, DLIF's Vice President of Finance, regarding his discussion with EisnerAmper about this issue. Referring to Gautham Deshpande, an EisnerAmper auditor assigned to the DLI audits, the email states:

1
2
3
4

"Mikhail (from the fund administrator Opus) and I just got off the phone with Gautham and had a couple of requests for some investment structuring for the financials. As of now we think it is in the best interest to breakout the Talking Capital Partners loan as a separate line item on the balance sheet (and disclosed in the notes) since it doesn't exactly fall into the same realm as the other loans; could you please provide us with the original loan agreement for our records? We can use this to craft the disclosure note."

5
6
7
8

230.    Despite Opus and Gautham's discussion of breaking out the Talking Capital loans as a separate line item on DLI's balance sheet and discussing it in the notes to DLIF's financials, there is no discussion in EisnerAmper's 2014 audit of the Talking Capital loans, not even in the notes on "concentration risk" or "risks inherent investing in the notes."

9
10
11
12
13

231.    Further, EisnerAmper did not disclose in its 2014 audit that Talking Capital had already defaulted on its first note when the second note was issued, did not disclose that there was no collateral backing the second note, did not disclose that Talking Capital had defaulted on the second note, and did not disclose that the $7 million in loans to Talking Capital were inconsistent with DLI's investment strategy of placing small loans with short term borrowers.

14
15
16

232.    Given the size of the Talking Capital notes and the fact that these notes were inconsistent with DLI's stated business strategy, EisnerAmper should have closely scrutinized all transactions with the company.

17
18
19

233.    Yet to help DLI and Ross conceal from investors its shifting investment "strategy" — moving away from small, short-term loans to providing credit facilities for new, high-risk ventures — EisnerAmper did not disclose their concerns regarding these notes in its 2014 audit.

20
21
22

234.    Had EisnerAmper performed further and appropriate diligence on the creditworthiness of Talking Capital, its principal (Forefront Capital), or the owner of that principal (Brad Reifler), it would have found:

23
24

    i.    That Mr. Reifler's former company, Pali Holding, Inc. had filed for Bankruptcy in 2010 in the Southern District of New York (10-11727);

25
26
27

    ii.    That Mr. Reifler had been sued by JP Morgan Chase in the Southern District of New York (11-CV-4016) relating to his default on a $4.5 million dollar note he had personally guaranteed for Pali Holdings, Inc.;

28

iii.     That another of Mr. Reifler's company's, Forefront Management Group was being sued in the Eastern District of Pennsylvania (11-cv-07732) by an investor, GBForefront, who had purchased $5,000,000 in notes from Forefront, for breach of contract and fraud; and

iv.     That the trustee in the Pali Holdings bankruptcy action, Yann Geron, had filed an adversary proceeding in the Southern District of New York (Adv. Pro. No. 13001178) alleging breach of fiduciary duty, fraudulent transfer, waste of corporate assets; and aiding and abetting breach of fiduciary duty. Geron's Complaint alleged: "From the outset and throughout the relevant time period, Pali Holding and Pali Capital did not have formalized systems of internal controls and checks and balances. There was little, if any, oversight over the use of corporate funds, and there was no system in place to make sure that supposed invoices for consulting fees or commissions to third parties were legitimate. Likewise, there were no systems in place to detect, report, and prevent the company from doing business with other entities that had undisclosed toes to corporate insiders."

235.     These were clear risk factors regarding DLIF's investments in Talking Capital. Its end of 2014 investments in Talking Capital Partners I and Talking Capital Partners II represented over 11% of its NAV.

236.     During the early part of 2015, DLIFs loans to Talking Capital accelerated. By the time EisnerAmper issued its 2014 audit of DLIF on July 1, 2015, DLIF had loaned over $28 million to Talking Capital Partners. This was an extreme concentration risk — 12.71% of the portfolio at the time. Yet EisnerAmper's 2014 audit makes no mention of the risk posed by this large position anywhere in the "Subsequent Events" note.

*EisnerAmper's Failure to Obtain Confirmation of DLI's Notes*

237.     In reviewing the book value of Level 3 assets, auditors are required to verify that management's valuation of assets is fair. To do so, auditors must scrutinize all Level 3 assets, in this case, all of DLI's underlying loans. Because Level 3 assets are inherently risky and not

1    subject to external valuation, each one must be evaluated. If an auditor chooses to use a sample

2    of the assets, it must ensure that its sample is large enough to detect any possibility of fraud.

3        238.    Despite the need to adequately audit Level 3 assets, AU-C § 501.05, EisnerAmper

4    performed virtually no review of DLI's loans. EisnerAmper selected just a meager sample of

5    DLI's loans to review — approximately 10% of outstanding obligations. It received responses to

6    less than half of these inquiries to borrowers in its attempt to obtain audit evidence to confirm

7    the assets, resulting in confirmations of less than 5% of DLI's loans.

8        239.    The lack of successful confirmations alone should have prompted EisnerAmper to

9    provide a limited opinion or withdraw as auditor, as AU-C § 705.07 requires that an auditor

10   provide a limited opinion or withdraw from an engagement where he or she cannot obtain

11   necessary evidence of an underlying asset.

12       240.    While EisnerAmper was engaged on January 8, 2015, it was not until after May

13   15, 2015 that EisnerAmper began sending confirmation requests to borrowers on loans that

14   DLIF had purchased from lending platform partners, including RealtyMogul, Biz2Credit, IOU

15   Central, Dealstruck, Quarterspot, and Talking Capital. This, despite the fact that DLI carried

16   approximately 1600 separate loans on its books on December 31, 2014 — the year end date of

17   EisnerAmper's audit period. The work to confirm these loans should have commenced shortly

18   after EisnerAmper began its engagement — not four months into the engagement on the eve of

19   issuing the audit.

20       241.    Beginning the confirmation so late in the process left EisnerAmper vulnerable to

21   relying on Ross to assist with its confirmation process, in contravention of professional standards

22   that require auditors to establish independent communication for the purposes of third party

23   confirmations.

24       242.    On June 29, 2015, two days before issuance of the 2014 audit, after getting few

25   written confirmations back from borrowers from any platform, Ross sent emails with the subject

26   line "platform confirms - desperate situation," to counterparties at Dealstruck, IOU Central,

27   Realty Mogul and Biz2Credit, copying Gautham, the EisnerAmper auditor. These "desparate

28   situation" emails read as follows:

"It's going down like this: I cannot get my audit completed unless more borrowers confirm the existence of their loans. I apologize 10X over for this last-minute request. Unfortunately, I have to get this audit done tomorrow . . . or I likely lose $20+ million in AUM. Gautham - Can you reply-all with which borrowers responded and which did not, perhaps in an update to your excel file? Gautham is going to resend the audit confirm email to borrowers . . . Anything you can do early tomorrow AM to get most of your remaining borrowers to reply to their emails with the word 'confirmed' would be worth a ton to me."

243.    But Ross' "desperate situation" emails did not result in EisnerAmper receiving the required written confirmation of the existence of a significant percentage of DLIF's loans. To take just one example regarding the Biz2Credit borrower confirmations, Gautham acknowledged that EisnerAmper had received just "3 out of 18" written confirmations.

244.    In short, EisnerAmper could not confirm the existence and status of a sufficient sample from borrowers, and failed to obtain sufficient audit evidence of the existence and status, including default status. Yet, under pressure from Ross, EisnerAmper recklessly issued the DLIF 2014 clean audit opinion with no modification as required by AU-C § 705.07.

*EisnerAmper Fails to Evaluate DLI's Valuation Methodology and Assumptions*

245.    On March 12, 2015, EisnerAmper engagement partner Modi received an email from Ross highlighting DLIF's murky and disorganized valuation protocols:

"As I shared with Gautham on the phone, you have my word that our plan within the next 60 days is to massively improve the process by which we produce a uniform period-end balance sheet that includes a simple, agreed-upon methodology for calculating a [discounted cash flow] Fair Market Value … I apologize that we weren't able to have this work done today to facilitate your audit. .. At this point I think you have a functional balance sheet with each loan's interest rate for all platforms except Quarterspot, which I am working on now. These files are far from perfect, and far from what I expect to be able to deliver for the Q1 2015 report.... The K1 process went smoothly, and I enjoyed working with Laura and Yvonne."[6]

---

[6] Ethan Senturia, the founder and CEO of Dealstruck, wrote in a recent book: "To the outside world, DLI was an institutional asset manager, but on the inside it was more of a start-up than we were. At the time (2015), . . . DLIF's risk management systems resided in Excel Spreadsheets. Its accounting policies were ill defined. And its investment process consisted of approval from a committee of one, a secret handshake, and, eventually, a signature on a document whose flimsy verbiage made it resemble a floppy disk circa 1970." Ethan Senturia, *Unwound. – Real-Time Reflections from a $tumbling Entrepreneur* 98 (2018).

246.     Despite clear evidence of DLIF's chaotic valuation methodology, EisnerAmper recklessly failed to test the reasonableness of DLI's valuation assumptions, including failing to adequately test default rates, failing to examine the current year financials, subsequent trial balances and available online information of borrowers and counterparties, and failing to obtain sufficient confirmation evidence, as required by AICPA and PCAOB standards, in order to test default and discount rates.

247.     Additionally, most of the fair value conclusions provided by management approximated par value, another red flag given that a significant number of loans were either in default or lacked confirmations. Indeed, each non-response to a confirmation request demanded further investigation, including tracking the investment cash flow. EisnerAmper failed to adequately investigate problem confirmations and instead just replaced the problem confirmations with new confirmation requests.

248.     Further, there is no evidence EisnerAmper ever tested the 17% discount rate DLI used across all of its notes, nor explored why it was lowered from the 27.8% to $38.9% range used by BDO in its 2013 audit. The failure to test the singular discount rate, rather than bucket investments into like-kind categories and apply different discount rates, was particularly reckless given that it is the most significant unobservable input.

249.     The coupon rates on the Schedule of Investments should have indicated to EisnerAmper a wide range of credit risks (11% to 228%), which makes the use of a single discount rate unreasonable. Furthermore, given such coupon rates, EisnerAmper should have tested DLI's default assumptions but did not because the lower discount rate resulted in a higher valuation of DLIF's assets.

250.     EisnerAmper's testing of DLI's valuation methodology was negligent and in violation of AU-C § 328 and other applicable AICPA and PCAOB standards.

*EisnerAmper Knows DLI is Unlicensed yet Needs to be Licensed to Operate*

251.     On April 5, 2015, Gautham emailed Ross, copying Modi and Maria Larsen: "One question I have at the moment is about Direct Lending Investment, LLC's (the GP entity) registration status. 2013 BDO financial statements mention that you are CA registered, but I was

1   unable to find the form ADV on IAPD." Ross responded to Gautham's inquiry stating

2   nonsensically that:

3       "We're just an LLC organized under the laws of California, but not an exempt reporting
        advisor with a short-form ADV. We will form an SEC-registered financial advisor either
4       when we get the N2 approved or in early 2016 even if we never get the N2 approved, as
        we will end 2015 over $150 million and so must file federally in early 2016 even though
5       we don't buy securities."

6       252.    At the time Gautham asked the question, DLI had not registered as an investment

7   advisor in either California, or with the SEC, even though Gautham knew that DLIF's assets

8   were then over $150 million. This was a significant red flag that was not disclosed in the

9   EisnerAmper audits.

10

11

12

13      *EisnerAmper Fails to Note Related-Party Relationships between Ross and DLI*

14  *Counterparties*

15      253.    In the notes to the 2014 audit, EisnerAmper made no disclosure of Ross'

16  ownership interests in several DLI counterparties — Realty Mogul, Quarterspot, Loan Hero,

17  Dealstruck, and Dealstruck Holdings, Inc.

18      254.    Yet on information, investigation and belief, as of December 31, 2014, over 70%

19  DLI's outstanding loans were made to or acquired from Realty Mogul, Quarterspot, Loan Hero,

20  Dealstruck and Dealstruck Holdings, Inc. — all platforms in which Ross or a Ross family trust

21  had an ownership interest.

22      255.    EisnerAmper prepared another 2014 audit of DLIF, issued on December 28, 2015,

23  to submit to the SEC to support DLI's N2 application. Unlike the 2014 audit EisnerAmper issued

24  on July 1, 2015 and delivered to investors and their RIA on or about that date (Ex. 1), the 2014

25  Audit issued December 28, 2015 (Ex. 2) and submitted to the SEC contained this note:

26      "Interests in Platforms - Affiliates of the General Partner own equity interests in three
        entities that serve as Lending Platforms for the Partnership. The equity interests were
27      acquired in private placements, privately negotiated transactions or on the open market if
        the Lending Platform's shares are publicly traded on terms comparable to the price paid

28

by unrelated third parties. The equity interests represent a de minimus share of ownership of the Lending Platform, and do not entitle the holder to exercise significant influence or control over the Lending Platform."

256.    Even the disclosure to the SEC, which was not made in the 2014 audit *given to investors* (and which was never corrected by EisnerAmper), was materially misleading, as it did not identify the platforms in which Ross owned an interest, nor disclose that approximately 70% of DLIF's loan portfolio consisted of loans to or acquired from platforms in which Ross owned an interest.

257.    On information and belief, EisnerAmper never complied with PCAOB AS 2410.18, which states:

"If the financial statements include a statement by management that transactions with related parties were conducted on terms equivalent to those prevailing in an arm's-length transaction, the auditor should determine whether the evidence obtained supports or contradicts management's assertion. If the auditor is unable to obtain sufficient appropriate audit evidence to substantiate management's assertion, and if management does not agree to modify the disclosure, the auditor should express a qualified or adverse opinion."[7]

### 2015 Audit by EisnerAmper:

258.    Like EisnerAmper's 2014 audit, the 2015 audit contained many deficiencies, all of which meant that EisnerAmper's clean audit opinion was mistated. EisnerAmper failed to disclose problems related to VoIP Guardian; ignored serious red flags identified by the SEC; failed to adequately test DLI's valuation methodology of its assets; failed to obtain reasonable confirmation and evidence of DLI's underlying assets; and overlooked clear evidence of phantom or fraudulent loans being carried by DLI's partner platforms.

*VoIP Guardian*

259.    In September 2015, for reasons most likely related to Brad Reifler's growing legal travails, the other principal in Talking Capital, Rodney Omanoff ("Omanoff"), formed VoIP Guardian. The operating agreement makes clear that Ross had an ownership interest in VoIP Guardian. Like Talking Capital, VoIP Guardian supposedly factored telecom receivables. The

---

[7] *See also* AS 2805.061, which requires that the auditor obtain written representations from management if the financial statements include such an assertion. Representations from management alone are not sufficient appropriate audit evidence.

written record reveals that DLI caused DLIF to lend $32.8 million to VoIP Guardian (and its related entities) *before any loan documents were signed.* By the time a loan security agreement was signed at the end of 2015, the loans already made exceeded the amount of that agreement by $12.8 million. That figure rose to $23 million by the end of January 2016.

260.    On February 16, 2016, Mottern emailed Brogan, Ross and Omanoff: "Everyone, attached is an amendment to increase the line amount for VoiP Guardian. The only issue I was not sure about was what date to make it effective as of. Please let me know if 12/31 is the wrong date before we send off to [Millennium Trust Company] for signature." Brogan replied the same day, again copying Ross and Omanoff: "Bob, We had $43M outstanding at VoIP Guardian as of January 31, 2016. Should the facility be increased to $50M instead of $40M?" Mottern replied to all: "Yes, it should be 50M." Omanoff did not sign the amendment increasing VoIP's facility to $50 million until March 9, 2016.

261.    EisnerAmper was well aware of these alarming irregularities. On February 10, 2016, Brogan emailed Ross:

> "You had asked me to send you a note regarding the VoIP Guardian issue. The Agreement that was executed with Rodney (Omanoff) stated a maximum facility amount of $20 million. However, on 12/31/15, the amount outstanding on the Balance Sheet was 32.8M. Eisner picked up on this during their review and asked if an amendment had been executed."

262.    On February 26, 2016, EisnerAmper auditor Yuriy Kitaygorodskyy ("Yuriy") emailed Brogan, copying Gautham, with a list of questions regarding VoIP Guardian, and its Tier 3 counterparties Indigo and IKBS. Yuriy's questions raised serious concerns about Talking Capital and VoIP, and whether their telecom financing was a fraudulent scheme:

> a) "How do TCP and VoIP gain comfort over the reporting provided by Switch? How do TCP and VoIP get comfortable that the same traffic is not sold to other providers?"
> b) "For the existing Tier 3 telecom providers, are TCP and VoIP the only providers of financing?"
> c) "How is TCP and VoIP comfortable that the invoice being purchased has not been sold to someone else?"
> d) "Who is Bradley Reifler (signatory on the Talking Capital Agreement)?"

263.    EisnerAmper also requested a slew of documents related to Talking Capital and VoIP, including: (a) copies of invoices between the Tier 1 and Tier 3 carriers; (b) reconciliation

1    of cash coming into DLI TC accounts in relation to what invoices are paid in a wire transfer; (c)

2    support for seven suspicious wire transfers; and (d) aging reports with all outstanding invoices

3    by Tier 1 and Tier 3 telecom providers as of December 31, 2015 for both VoIP and Talking

4    Capital.

5           264.    On March 7, 2016, Omanoff responded to Yuriy's email, providing evasive

6    responses to EisnerAmper's questions, but confirming some obvious red flags, including: (a) that

7    multiple sales of receivables by the Tier 3 telecoms were prevented because Talking Capital and

8    VoIP have their own "switch" operated by their "technology department" run by Joseph Rahman

9    and Christopher Lara; (b) that Talking Capital and VoIP were the only providers of financing for

10   the existing Tier 3 carriers; and (c) that Bradley Reifler was a 1/3 owner of Talking Capital

11   through his company Forefront Partners, LLC.

12          265.    Omanoff's identification of Joseph Rahman and Christopher Lara as Talking

13   Capital and VoIP Guardian's "technology department" should have alarmed EisnerAmper, as on

14   July 17, 2015 both were sued in an adversary proceeding related to the bankruptcy of Huntington

15   Telecom, LLC, along with Mark Proto, who was the sole shareholder of "Mudmouth."

16   Mudmouth in turn owned 33.33% of Talking Capital and 40% of VoIP Guardian. The

17   Huntington Telecom Complaint alleged a massive scheme involving money laundering through

18   phony telecom receivables.

19          266.    None of EisnerAmper's concerns regarding VoIP Guardian were disclosed in the

20   notes to its 2015 audit, including that DLI made loans to VoIP Guardian before any agreements

21   were executed and that its loan authorizations were backdated. To the contrary, the audit notes

22   blandly state that DLI "provides a revolving loan facility with maximum facility amount of $50

23   million to VoIP Guardian Partners I, LLC."

24          *The SEC's Comments*

25          267.    On February 8, 2016, the SEC delivered to Ross a thirteen-page letter in response

26   to the N2 Registration application DLI had submitted to the SEC in December 2015. The letter,

27   which was forwarded to EisnerAmper upon receipt by DLI, included the following comments:

28

"12.    [DLI] . . . does not appear to be registered under the Investment Advisers Act of 1940. Please provide a legal analysis explaining why (DLI) . . . is not currently registered as an investment adviser.

…

41.    Investment Objective and Principal Investment Strategies - Market Opportunities: This section discusses the market opportunity for making loans to small and middle market businesses. There is, however, no information in this section more recent than 2012. Please update the information in this section and delete stale information.

…

45.    Please disclose whether the Lending Platforms are audited. Please disclose what procedures the auditor utilizes to verify the existence of individual loans. . . . What does the Fund receive as evidence of its interest in the investment?

…

48.    FASB Accounting Standards Codification ("ASC") 820 requires entities to develop estimates of fair value from the perspective of a market participant, in the absence of observable trade data for a given instrument. . .. Is each loan individually fair valued.  If not, please explain what your unit of account is and how it meets the requirements for estimating fair value under ASC 820.

…

51.    Please explain to us how the default rate assumptions were determined.

…

55.    The unobservable inputs disclosure suggests that the discount rate assumption and default rate assumption apply across the entire loan pool. Please explain why all of the loans in the portfolio have the same discount rate and default rate assumptions and how that is consistent with ASC 820.

…

62.    Considering the interest in Lending Platforms held by affiliates of the general partner, please confirm whether all related party transactions (have) been appropriately disclosed in accordance with ASC 850.

…

65.    Please confirm that all defaulted loans are identified in the SOI (schedule of investments)."

268.    The SEC's comment letter also portentously advised DLI that "the Division of Enforcement has access to all information you provided to the staff of the Division of Investment Management in connection with our review of your filing."

269.    Ross's first reaction to the SEC comment letter was set forth in an email dated February 8, 2016 to Mottern and copied to Gautham: "This is incredibly detailed and massively burdensome. Gautham — please continue to focus on the Audit and K1, which need to be completed regardless of our response. Please don't burn hours on this letter yet before Bob and I have a chance to regroup and determine our game plan."

270.     On April 5, 2016, Gautham emailed Brogan stating: "Our internal evaluation experts (corporate finance group) want to get a response to the. . . questions raised by the SEC in its comment letter re valuations."

271.     On information, investigation and belief, EisnerAmper ignored the SEC's concerns regarding DLI's valuation methodology. It simply confirmed the fairness of DLI's valuation methodology, without attempting to value any individual loans and without "bucketing" the DLI loans into categories with similar characteristics.

*EisnerAmper Fails to Collect Sufficient Confirmation and Ignores Clear Indicia of Fraud*

272.     Like the 2014 Audit, EisnerAmper failed to obtain the required written confirmation of the existence of DLI's loans. For 2015, EisnerAmper decided that it needed written confirmations for 80% of the loans made by each lending platform, but achieved nowhere near that number.[8] On information, investigation and belief, by the time EisnerAmper issued the 2015 Audit on June 23, 2016, borrower confirmations from each platform ranged between 20% and 30%. The confirmations returned from Quarterspot, IOU Central and Dealstruck were 27%, 23% and 20%, respectively.

273.     As one example, Yuriy requested information from Dealstruck, emailing on February 24, 2016 to request sample documentation on 40 loans. In a follow up email dated February 29, 2016, Yuriy asked Dealstruck's CFO for "a quick call sometime tomorrow to understand how we will access the documents for each loan," and further asked: "How does Dealstruck insure that one loan is not used as collateral to more than one investor?"; "How is interest calculated and recorded separate from principal?"; and "What is the process for reporting back to investors such as the Direct Lending Income Fund?"

274.     In response to EisnerAmper's questions, Dealstruck emailed Brogan: "I apologize for the delay in getting back to EisnerAmper, Larry. But after looking into further what they are

---

[8] EisnerAmper determined in February and March 2016 to obtain the following number of written confirmations from borrowers on these platforms: 60 from Biz2Credit; 40 from IOU Central; 40 from Loan Hero; 40 from Dealstruck, 40 from Forward Financing and 40 from Lending USA.

asking for, this is a 'quantum leap' increase in information requests vs. last year.... Is there a way that we can cut back the scope as well as the sample size to 10 loans?" Brogan responded: "I'll reach out to Eisner to see what they can do."

275.     At this time, at least $2 million in loans that Dealstruck had sold to DLIF had defaulted. In his book, Ethan Senturia, CEO of Dealstruck, frankly admits that he and Ross devised a plan to conceal from DLIF investors these defaulted loans:

> "In Dealstruck, Brendan was running up against his first opportunity to take his first loss, and he was willing to fight tooth and nail not to. He was managing money for 1000+ rich people who could ask for it back on short notice and who, he feared, would run for higher ground at even the slightest sign of trouble. If Dealstruck went down, his fund might go down with it. Buying more loans was buying more time, and, to Brendan, pushing potential losses as far into the future as he could - even if they ended up larger - was sound business, not psychological dysfunction."[9]

Senturia summarized the solution they devised as follows: "Dealstruck would purchase DLI's (defaulted) loans, but cover the losses over time: in exchange, DLI would continue to fund new loans."

276.     This pattern was evident to EisnerAmper. Yet, under pressure from Ross, EisnerAmper recklessly issued the DLIF 2015 clean audit opinion anyway, with no modification, as required by AU-C § 705.07.

277.     Even more troubling, EisnerAmper uncovered evidence that some of DLI's underlying loans carried on its books at the end of 2015 probably did not exist. One purported borrower, claimed in response to a confirmation request from EisnerAmper, "I have no knowledge of your company having any connection to my company in any way. Consider this notification to cease any further communication." Another purported borrower told EisnerAmper, "I have not signed any promissory note or anything at all." Yet another purported borrower informed EisnerAmper that he "never had any type of loan" that would be reflected on DLI's books.

---

[9] Ethan Senturia, *Unwound. – Real-Time Reflections from a $tumbling Entrepreneur*, p. 99 (2018)

278.    Moreover, a significant number of mailed or emailed confirmation requests were returned to the sender, possibly implying that the addresses or contact information for the borrowers did not exist and either the underlying loans were defaulted or fraudulent.

279.    Despite these warnings, EisnerAmper gave a clean audit opinion with no indication that the loans might be suspect or that the borrowers would challenge their existence.

*Failure to Note Shift in Investment Strategy Prior to December 2015 PPM*

280.    In December 2015, DLI circulated a new PPM to investors which announced new focuses in investment strategy. Significantly, the December 2015 PPM announced that DLI would be investing in "non-bank lenders," would begin co-investing in "special purpose vehicles" with lending partners, and would rely on lending partner platforms to perform all due diligence on borrowers. Contrary to its prior investment strategy, which focused on providing short term amortizing loans to creditworthy U.S.-based businesses, DLI announced that it would also invest in unsecured loans, accounts receivable and joint ventures.

281.    These changes were so significant that the December 2015 PPM effectively summarized a new investment.

282.    In truth, however, DLI had already shifted to this alternative investment strategy long before the December 2015 PPM was circulated to investors. Beginning at the end of 2014 with DLI's investment in Talking Capital, and continuing through 2015, DLI made substantial investments that did not reflect its original investment thesis of providing small (under $250,000) short term amortizing loans to creditworthy borrowers with established businesses. It invested tens of millions of dollars in both Talking Capital and VoIP Guardian (neither of which had any operating history before DLI's loans); it invested tens of millions in "fix and flip" real estate deals in Los Angeles; it began making direct loans to platforms of well over $250,000; and it began making unsecured loans.

283.    As part of its engagement, EisnerAmper committed to reviewing DLI's investors letters and PPMs to ensure consistency between EisnerAmper's stated investment objectives and its portfolio. Despite clear knowledge that EisnerAmper's portfolio did not match its stated investment strategy for 2015 (until the PPM was updated) EisnerAmper did not disclose in its

1  2015 audit that Partnership assets were used to make investments that were inconsistent with

2  representations to the limited partners about the DLI's investment strategy.

3      284.    The December 2015 PPM identified EisnerAmper as DLI's auditor, and Plaintiffs

4  herein all made an investment decision to remain in the fund in part in reliance on

5  EisnerAmper's engagement as auditor and its clean audit opinions.

6          **Plaintiffs' Reliance and Damages:**

7      285.    Plaintiffs bring these claims in their respective individual capacities as limited

8  partners of DLIF. Each plaintiff was induced by EisnerAmper's false clean audits to invest in and

9  continue to hold their investments in DLIF to the exclusion of other investment opportunities.

10  Each plaintiff invested at different times in different amounts, as well as continued to hold, in

11  reliance on direct representations made by EisnerAmper to either Plaintiffs themselves or to their

12  RIAs and/or other advisers. Some Plaintiffs invested on multiple occasions in reliance on

13  EisnerAmper's auditing work while others made a single investment, or decided to hold their

14  investments in the Funds in reliance on EisnerAmper's auditing work.

15      286.    Separate from their out-of-pocket losses and lost profits from foregoing other

16  investment opportunities, each Plaintiff incurred damages related to payment of taxes on phantom

17  income. Because the Funds are "pass through" entities with no independently taxable income, the

18  profits of the Funds were allocated to the limited partners under the distributive share of each

19  partner. Each individual partner paid taxes on the profits allocated to his or her capital account.

20          **FIRST CAUSE OF ACTION**

21          **(Negligent Misrepresenation)**

22      287.    Plaintiffs incorporate by reference the allegations contained in the preceding and

23  subsequent paragraphs of this Complaint as if fully set forth herein.

24      288.    For the fiscal years ending 2013, 2014 and 2015, EisnerAmper expressed an

25  unqualified opinion that the financial statements of DLI were presented fairly and free of material

26  misstatement or omission.

27      289.    In each of its audits, attached hereto as Exhibits 1-3, EisnerAmper stated that: (a) it

28  believed its auditing work provided a reasonable basis for its opinion; (b) the financial statements

subject to the Audit were prepared in conformity with GAAP; (c) the financial statements subject

to the Audit were free of material misstatement; (d) the financial statements subject to Audit

presented fairly, in all material respects, the financial position and results of operations and cash

flows of DLIF as of December 31 of the relevant year; and (e) the Audits were performed in

compliance with GAAS.

290.    None of these statements were true.

291.    In 2013, EisnerAmper failed to disclose that it was restating an audit previously

performed by BDO, a disclosure that is required under GAAS. Thus, EisnerAmper's statement

that the audit was "performed in compliance with GAAS" was false. Had EisnerAmper revealed

that it had been asked to author a new 2013 audit it would have alerted DLIF's investors that

DLIF was auditor shopping and raised concerns regarding EisnerAmper's audits.

292.    To the contrary, EisnerAmper authored the 2013 audit to help DLI conceal the

2013 BDO audit which contained an "Emphasis of Matter," pointing out a material risk in DLI's

valuation of its assets.

293.    In its 2014 audit, EisnerAmper did not disclose that Talking Capital had defaulted

on its loans, nor that it had failed to obtain sufficient confirmation evidence from DLI regarding

its underlying assets. EisnerAmper further did not disclose myriad concerns from the SEC in its

audit, nor did it disclose that DLI was unlicensed and needed to secure an investment advisor

license from the State of California. Finally, EisnerAmper failed to disclose any related party

transactions at DLI, even though Ross owned a stake in loan platforms from which DLI secured

approximately 70% of its loans. Thus, EisnerAmper's representations that it performed an audit in

accordance with GAAS, that it believed its work provided it a sufficient basis to form its

opininion, and that DLI's financial statements were free of misstatement and presented fairly

were false.

294.    In its 2015 audit, EisnerAmper failed to disclose that DLI was lending money to

VoIP Guardian without executed agreements and backdated loan authorizations; that DLI had

shifted its investment strategy over the course of 2015, which was belatedly disclosed to investors

in a December 2015 PPM; that the SEC had significant concerns about DLI's valuation

1   methodology, including improperly bucketing all assets together and utilizing a single discount

2   rate across its varied assets; that "borrowers" on loans carried on DLI's books claimed the loans

3   did not exist; and that it did not obtain sufficient confirmation evidence to support its clean audit

4   opinion.

5        295.    EisnerAmper intended Plaintiffs and/or their investment advisors to rely on their

6   audits of DLI. Indeed, EisnerAmper required DLI to share with EisnerAmper any marketing or

7   other materials distributed by DLI that referred to EisnerAmper or its audits for EisnerAmper's

8   review. The January 2015 PPM and the December 2015 PPM both prominently featured

9   EisnerAmper as DLI's auditor. Other marketing materials to solicit investments in DLI also

10   prominently featured EisnerAmper as DLI's auditor. Periodic investor letters distributed by DLI,

11   typically monthly, also frequently referred to EisnerAmper and its work as auditor.

12        296.    EisnerAmper reviewed these materials distributed by DLI and consented to their

13   distribution, meaning they understood that Plaintiffs and other DLI investors and their financial

14   advisors would be relying on EisnerAmper's audit opinions.

15        297.    EisnerAmper was acutely aware that their audits were used by DLI to both solicit

16   investments and manage investor relations. DLI was a startup in a new financial space. Many of

17   the companies that it invested in were themselves startups. DLI's investors were all qualified

18   investors who performed significant due diligence on DLI before investing, and relied on

19   EisderAmper's audit.

20        298.    Because of EisnerAmper's material misstatement offering clean opinions on DLI's

21   financials, Plaintiffs were harmed. They either would all have not invested in the first place had

22   EisnerAmpner not offered a clean opinion or they would have exited DLI much earlier.

23        299.    As a direct and proximate result of EisnerAmper's negligent misrepresentations,

24   and Plaintiffs' reliance thereon, Plaintiffs have been damaged in an amount to be determined at

25   trial.

26                      **SECOND CAUSE OF ACTION**

27                      **(Common Law Fraud and Deceit)**

28

300.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

301.    For the fiscal years ending 2013, 2014 and 2015, EisnerAmper expressed an unqualified opinion that the financial statements of DLI were presented fairly and free of material misstatement or omission.

302.    In each of the audits, attached hereto as Exhibits 1-3, EisnerAmper stated that: (a) it believed its auditing work provided a reasonable basis for its opinion; (b) the financial statements subject to the Audit were prepared in conformity with GAAP; (c) the financial statements subject to the Audit were free of material misstatement; (d) the financial statements subject to Audit presented fairly, in all material respects, the financial position and results of operations and cash flows of DLIF as of December 31 of the relevant year; and (e) the Audits were performed in compliance with GAAS.

303.    These statements were false.

304.    EisnerAmper knew that its issuances of clean audit opinions in 2013, 2014 and 2015 were false and misleading.

305.    First, EisnerAmper was selected to audit DLI's 2013 financials even though BDO had already completed a 2013 audit.

306.    Significantly, BDO's 2013 audit contained an "Emphasis of Matter" in its audit, highlighting the risk of DLI's valuation methodology.

173.    DLI and Brendan Ross, dissatisfied with BDO's opinion, shopped for an auditor who was more willing to issue a clean audit opinion, which was central to Ross's ability to secure further investments for his Ponzi scheme over time.

307.    EisnerAmper knowingly and willingly participated in this scheme. EisnerAmper authored a new 2013 audit which replaced BDO's audit. EisnerAmper's 2013 audit makes no reference to the BDO audit and does not refer to its own audit as a restated audit, thus concealing from DLI investors and potential investors that a prior auditor had reached a much more conservative opinion on DLI's financials than EisnerAmper.

1      308.    Disclosure that an audit is being restated, and the reasons therefore, is a basic

2  auditing requirement.

3      309.    Concealment of the 2013 BDO audit was critical to Ross's ability to raise

4  additional funds.

5      310.    EisnerAmper's perfunctory review of DLI's finances was so deficient that it

6  amounted to the equivalent of no audit at all. Its statements in the 2013, 2014 and 2015 audits that

7  it performed audits in accordance with GAAS and that it believed its work provided it with a

8  sufficient basis to form an opinion were false and misleading. For its 2014 audit, for instance,

9  EisnerAmper requested confirmation evidence regarding just a miniscule fraction of DLI's loans,

10  approximately 5%, and even then only received actual confirmation on approximately 1/3 of

11  these loans. For its 2015 audit, EisnerAmper repeated that process, receiving audit evidence on

12  just a tiny fraction of DLI's loans. More significantly, EisnerAmper had actual knowledge that at

13  least three of DLI's borrowers it contacted from its miniscule sample claimed the loans on DLI's

14  books did not exist. Despite its lack of sufficient audit evidence and actual knowledge of possible

15  phantom loans, EisnerAmper issued clean audit opinions.

16      311.    EisnerAmper's audit procedures were so deficient and so reckless as to not amount

17  to an audit at all.

18      312.    Because of EisnerAmper's material misstatement offering a clean opinion on

19  DLI's financials, Plaintiffs were harmed. They either would all have not invested in the first place

20  had EisnerAmpner not offered a clean opinion or they would have exited DLI much earlier.

21      313.    As a direct and proximate result of EisnerAmper's fraud and decit, Plaintiffs have

22  been damaged in an amount to be determined at trial.

23                  **THIRD CAUSE OF ACTION**

24                    **(Aiding and Abetting Fraud)**

25      314.    Plaintiffs incorporate by reference the allegations contained in the preceding and

26  subsequent paragraphs of this Complaint as if fully set forth herein.

27      315.    As set forth more fully above, DLI and Ross perpetrated fraud on investors by

28  overstating valuations, charging false management and performance fees, failing to disclose

related- party transactions, and the misusing investor funds. Specifically, DLI and Ross knowingly engaged in a scheme to defraud Plaintiffs by:

      i.    Making misrepresentations about DLI's assets, net income, and investment returns and valuations;

      ii.   Concealing DLI and its investment platforms' dire financial condition;

      iii.  Overstating valuations to calculate and extract inflated management and performance fees from investors.

316. As DLI's independent auditor for the years 2013, 2014 and 2015, EisnerAmper was responsible determining whether DLIF and DLIFF's financials were fairly presented, including the value of its assets and the valuation metrics used by management to determine a value of the Funds Level 3 assets.

317. EisnerAmper knew, given its consent for DLI to distribute PPMs and investor letters prominently featuring its name, that investors and potential investors, and specifically Plaintiffs, relied upon its audits, particularly because the Funds invested in hard-to-value, illiquid Level 3 assets.

318. EisnerAmper knowingly and substantially assisted DLI and Ross in unlawfully defrauding Plaintiffs. Amongst other incidents, EisnerAmper assisted DLI and Ross by authoring a new 2013 audit that failed to contain an "Emphasis of Matter," as a previous audit authored by BDO contained; EisnerAmper did not disclose that its 2013 audit was a restatement of BDO's audit; EisnerAmper knew that a number of borrowers reported that the loans on DLI's books did not exist, yet issued clean audits; EisnerAmper knew that Talking Capital had defaulted on its first loan prior to DLIF making additional loans to the company, but did not include a note on the 2014 Talking Capital loans in its 2014 audit; and EisnerAmper failed to disclose DLIF's increasing reliance on large, high-risk loans that were contrary to its stated business strategy of providing small, short term loans to high credit borrowers.

319. EisnerAmper recklessly failed to obtain sufficient confirmation evidence to issue a clean audit opinion on DLIF's financials, yet did so anyway.

320.     EisnerAmper knew that by verifying DLI and Ross' material misrepresentations concerning the value of DLI assets and bolstering DLI's credibility with investors, its audits would induce Plaintiffs to invest, remain invested, or make further investments in the Funds.

321.     In connection with providing substantial and material assistance to DLI and Ross, EisnerAmper was aware of its role in the DLI/Ross fraud and acted knowingly in assisting DLI and Ross.

322.     Plaintiffs justifiably relied upon the materially misleading audits prepared by EisnerAmper, without knowing they were false, in deciding whether to invest, hold their investments, or make additional investments in the Funds.  They also relied on the accuracy of those valuations in making excessive management and performance fee payments as well as tax payments.

323.     As a direct and proximate result of EisnerAmper's aiding and abetting of fraud, Plaintiffs have been damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

324.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

325.     At all relevant times, DLI was the general partner of DLIF and DLIFF.  As general partner, DLI owed fiduciary duties to limited partners, including Plaintiffs.

326.     At all relevant times, Ross was the CEO of DLI.  At all relevant times, Ross maintained considerable control over DLI and had substantial discretion and control over the Funds' investments and assets, Plaintiffs' investments, and the Funds' communications to Plaintiffs.

327.     Ross and DLI's discretion and control gave rise to fiduciary duties to Plaintiffs as DLI and Ross occupied a superior position over Plaintiffs with respect to their management and control over their investments in the Funds, and had superior access to confidential information about DLI's investments and assets. DLI and Ross' superior position necessitated that Plaintiffs

repose their trust and confidence in the DLI and Ross, and Plaintiffs did so by investing in the Funds and relying on DLI and Ross's purported expertise and skill.

328.   By reason of their controlling positions, actions, and direct and indirect representations to Plaintiffs, and by reason of the investors having deposited funds into Ross' control with the understanding he would act in accordance with their promises in regard to the use of such funds, DLI and Ross owed investors fiduciary duties of loyalty and care and to deal honestly and in good faith.

329.   DLI and Ross breached their fiduciary duties to Plaintiffs by, among other things, fraudulently inflating the value of DLIF's assets, concealing defaults on DLIF's underlying asset and hiding related-party transactions from Plaintiffs.

330.   Based on its knowledge of DLI's business model and lending activity, EisnerAmper knew that DLI and Ross owed fiduciary duties to investors, including Plaintiffs. EisnerAmper also knew that Ross and DLI had discretion and control giving rise to a fiduciary duty and duty of care to Plaintiffs.

331.   As demonstrated by the facts stated herein, EisnerAmper knowingly provided substantial assistance to DLI and Ross' breaches of fiduciary duty with knowledge that they were breaching those duties. Amongst other incidents, EisnerAmper assisted DLI and Ross by authoring a new 2013 audit that failed to contain an "Emphasis of Matter," as a previous audit authored by BDO contained; EisnerAmper did not disclose that its 2013 audit was a restatement of BDO's audit; EisnerAmper knew that a number of borrowers reported that the loans on DLI's books did not exist, yet issued clean audits; EisnerAmper knew that Talking Capital had defaulted on its first loan prior to DLIF making additional loans to the company, but did not include a note on the 2014 Talking Capital loans in its 2014 audit; and EisnerAmper failed to disclose DLIF's increasing reliance on large, high-risk loans that were contrary to its stated business strategy of providing small, short term loans to high credit borrowers.

332.   EisnerAmper further failed to obtain sufficient confirmation evidence to issue a clean audit opinion on DLIF's financials, yet did so anyway.

333.     EisnerAmper's deficient audits provided substantial assistance to Ross and DLI as the deficient audits conveyed to DLIF and DLIFF's limited partners that the financials of the Funds were stated fairly, when, in fact the assets under management were substantially overstated and Ross was engaged in numerous transactions with companies in which he was an owner.

334.     As a direct and proximate result of EisnerAmper's aiding and abetting of breach of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(Aiding and Abetting Securities Fraud in Violation of Cal. Corp. Code § 25403(b))**

335.     Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

336.     As set forth more fully above and herein, DLI and Ross perpetrated securities fraud on Plaintiffs herein in connection with the December 2015 PPM by making materially untrue statements and failing to omit material facts.

337.     Specifically, the December 2015 PPM described DLI as a "specialty investment company focused on generating a high level of current income through investments in loans to small and medium sized businesses and non-bank lenders," when in reality DLI was a ponzi scheme run by Ross that relied on Ross's connections to and undisclosed ownership interests of DLI's partners to assist with materially misstating DLI's NAV.

338.     Plaintiffs herein were faced with an investment choice after receipt of the December 2015 PPM — stay in the fund or exit upon 35 days' notice. The investment strategy outlined in the December 2015 PPM was fundamentally different from the original investment Plaintiffs herein made, including shifting from focusing on small, short term loans to creditworthy borrowers and instead focusing on lending to non-bank lenders with collateral in riskier assets, such as Tier 3 telecom receivables from Africa and Eastern Europe. The economic reality was such DLI was effectively a new investment after the December 2015 PPM. Thus the December 2015 PPM was an offer of a security within the meaning of California Corporations Code section 25401.

339.   Based on its knowledge of DLI's business model and lending activity, EisnerAmper knew that the December 2015 PPM was materially false and misleading.

340.   As demonstrated by the facts stated herein, EisnerAmper knowingly provided substantial assistance to DLI and Ross' securities fraud with knowledge that they committing securities fraud. Amongst other incidents, prior to the December 2015 PPM, EisnerAmper assisted DLI and Ross by authoring a new 2013 audit that failed to contain an "Emphasis of Matter," as a previous audit authored by BDO contained; EisnerAmper did not disclose that its 2013 audit was a restatement of BDO's audit, thus helping to conceal the "Emphasis of Matter" from DLI's investors and potential investors; EisnerAmper knew that Talking Capital had defaulted on its first loan prior to DLIF making additional loans to the company, but did not include a note on the 2014 Talking Capital loans in its 2014 audit; EisnerAmper knew that DLI had shifted its investment focus to provide funding to non-bank lenders well in advance of the December 2015 PPM — thereby utilizing investor funds for purposes which were not authoritzed — yet failed to disclose that in its 2014 or 2015 audit; and EisnerAmper failed to disclose DLIF's increasing reliance on large, high-risk loans that were contrary to its stated business strategy of providing small, short term loans to high credit borrowers.

341.   EisnerAmper provided substantial assistance to Ross and DLI in perpetrating securities fraud by reviewing the December 2015 PPM in advance of its distribution and agreeing to let DLI identify EisnerAmper as its auditor, with knowledge that it did not accurately convey the nature of an investment in DLI.

342.   As a direct and proximate result of EisnerAmper's aiding and abetting securities fraud, Plaintiffs have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.   For special damages according to proof;

2.   For general damages according to proof;

3.   Rescissionary damages according to proof;

1    4.    For attorneys' fees and costs according to proof;

2    5.    For punitive and/or exemplary damages according to proof;

3    6.    For pre-judgment interest from the date of purchase;

4    7.    For post-judgment interest according to law; and

5    8.    For such other and further relief as the court may deem proper.

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15                              **JURY DEMAND**

16       Plaintiffs demand a trial by jury on all issues so triable.

17   Dated: February 8, 2021                REISER LAW, p.c.

18                                          THE MEADE FIRM p.c.

19

20                                   By:    _____*/s/  Tyler Meade*_____

21                                          Tyler Meade
                                            Attorneys for Plaintiffs

22
                                            Additional Counsel for Plaintiffs (With Pro
23                                          Hac Vice Applications Forthcoming):

24                                          Jeffrey C. Schneider, Esq.
                                              *jcs@lklsg.com*
25                                          Jason Kellogg, Esq.
                                              *jk@lklsg.com*
26                                          Victoria J. Wilson, Esq.
                                              *vjw@lklsg.com*
27
                                            LEVINE KELLOGG LEHMAN
28                                          SCHNEIDER & GROSSMAN LLP

201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789